## Ex parte MOORE.

The court will take judicial notice of the location of a section of land in a government survey.

The court will take judicial notice of the boundaries of Indian reservations within the state, and which are not subject to its jurisdiction.

Act Cong. March 2, 1889, c. 405, 25 Stat. 888, dissolving the Great Sioux reservation, restored a certain section of land to the public domain. This section was later allotted to an Indian. Section 13 of the act provided that Indians residing on portions not included in the reservations therein established might claim the land upon which they resided as an allotment, and Act Feb. 8, 1887, c. 119, 24 Stat. 389, and Act Feb. 28, 1891, c. 383, 26 Stat. 795, both provided that an Indian might procure an allotment on the government domain outside of the boundaries of a reservation. **Held,** that the section of land in question was no longer Indian country reservation over which the United States had exclusive jurisdiction, and

the allotment of it to an Indian under any of the statutes named did not change its character.

The United States courts have not exclusive jurisdiction over an offense committed by one Indian against another Indian on an Indian allotment upon the public domain outside the boundaries of any reservation and within the limits of the state.

The enabling act of South Dakota (Act Feb. 22, 1889, c. 180, § 4, 25 Stat. 676) provided that the state should disclaim all title to lands held by any Indian or Indian tribes until the title thereto shall have been extinguished by the United States, and the same shall remain subject to the disposition of the United States and under the absolute jurisdiction and control of Congress. Act March 2, 1889, c. 405, 25 Stat. 888, restored a large amount of the Indian land to the public domain, though it allowed the Indians to take allotments therein. **Held,** that the enabling act did not prevent the state from taking jurisdiction over crimes committed in the territory which was restored to public domain, and the mere fact that an Indian took allotments therein did not make such allotments quasi Indian reservations under the exclusive jurisdiction of the United States.

(Opinion filed, December 11, 1911.)

Appeal from Circuit Court, Minnehaha County. Hon. JOSEPH W. JONES, Judge.

Application by Van Francis Moore for a writ of habeas corpus discharging him from imprisonment in the state penitentiary. From a judgment denying the writ, he appeals. Affirmed.

*William G. Porter* and *Perrett F. Gault,* for appellant. The *Attorney General,* for the State.

McCOY, J. This is an appeal by Van Francis Moore from an order and judgment of the circuit court of Minnehaha county denying his application for discharge from imprisonment in the state penitentiary under habeas corpus proceedings, and remanding him to his former imprisonment. It appears from the record that on the 9th day of July, 1900, an information was made and filed in the circuit court of Stanley county, by the state's attorney, charging the appellant with having on the 14th day of May, 1900, killed and murdered one Susan Tin Cup at Bad river, in the county of Stanley, state of South Dakota, and that thereafter, on the 12th day of July, 1900, the appellant entered a plea of guilty to the said charge of murder, and was thereon sentenced to life imprisonment in the state penitentiary, and that he has

since been and is now imprisoned therein. It further appears that appellant is a Sioux Indian, and has taken an Indian allotment on the Cheyenne River Indian reservation, and that the murdered woman, Susan Tin Cup, was also a Sioux Indian, who drew rations as a member of the Sioux Tribe of Indians of the Cheyenne agency. Upon his application for habeas corpus appellant presented his own affidavit, and also the affidavits of other parties containing the sworn statement of fact that the said offense of murder, charged against appellant for and on account of which he is now imprisoned, was committed within the boundaries and limits of the Cheyenne River Indian reservation, and upon an Indian allotment· in said Stanley county, but within the boundaries of said Indian reservation; that the said offense for which the appellant is imprisoned was committed on the allotment of one Walking Eagle, a Sioux Indian, on section 13, township 4 N., of range 30 E., of Black Hills meridian. The appellant contends that his trial, conviction, and sentence in the state circuit court of Stanley county were illegal, null, and void; that the said state circuit court exceeded the limits of its jurisdiction as to matter, place, and person; that the place where the said offense was committed was within the exclusive jurisdiction of the United States, and the person against whom the offense was committed and the person alleged to have committed the crime were subject to the exclusive jurisdiction of the United States; that appellant is now imprisoned without due process of law; that the said offense over which the state circuit court of Stanley county assumed jurisdiction was committed upon an Indian allotment within the limits and boundaries of the Cheyenne River Indian reservation, in the state of South Dakota, and was committed by one Indian upon the person of another Indian. If the state of facts upon which appellant bases his contention that the state circuit court was without jurisdiction to hear and determine the charge of murder against him were true, it would, indeed, present a very serious contention; but the statement that the place where the said offense was committed was within the boundary and limits of the Cheyenne River Indian reservation is absolutely and wholly false and untrue.

[1] This court will take judicial notice of the location of section 13, township 4 N., of range 30 E., of Black Hills meridian, a system of government survey.

[2] This court will also take judicial notice of the territorial limits and boundaries of its own jurisdiction, and consequently will take notice of the limits and boundaries of the Cheyenne River Indian reservation, and the acts of Congress defining the same. Peano v. Brennan, 20 S. D. 342, 106 N. W. 409.

[3] Section 13, township 4 N., of range 30 E., of Black Hills meridian, where defendant committed said murder, is not now and never was any part or within any part of the Cheyenne River Indian reservation; but, on the contrary, is about 30 miles away from the nearest point of said reservation. Prior to March, 1889, the Indian country located in the Dakotas west of the Missouri River was legally known as the "Great Reservation of the Sioux Nation," and of which the said section 13 on which defendant committed said murder was a part. By Act Cong. March 2, 1889, 25 Stat. 888, the Great Reservation of the Sioux Nation was dissolved and divided into smaller reservations, a portion thereof being restored to the public domain. . The title of the act reads as follows: "An act to divide a portion of the reservation of the Sioux Nation of Indians in Dakota into separate reservations, and to secure the relinquishment of the Indian title to the remainder, and for other purposes." By section 1 of said act the Pine Ridge reservation was created, and the limits and boundaries thereof defined. By section 2 the Rose Bud reservation was created. By section 3 the Standing Rock reservation was created. By section 4 the Cheyenne River Indian reservation was created, and the boundaries and limits thereof specifically defined, as follows: "That the following tract of land, being a part of the said Great Reservation of the Sioux Nation, in the territory of Dakota, is hereby set apart as a permanent reservation for the Indians receiving rations and annuities at the Cheyenne River agency in the said territory of Dakota, namely: Beginning at a point in the center of the main channel of the Missouri river, ten miles north of the mouth of the Moreau river, said point being the southeast-

ern corner of the Standing Rock reservation; then down said center of the main channel of the Missouri river, including also entirely within said reservation all islands, in said river, to a point opposite the mouth of the Cheyenne river, thence west to said Cheyenne river, and up the same to its intersection with the one hundred and second meridian of longitude; thence north along said meridian to its intersection with a line due west from a point in the Missouri river ten miles north of the mouth of the Moreau river; thence due east to the place of beginning."

From this description of the particular boundaries and limits of the Cheyenne River Indian reservation it will be observed that the said section 13 whereon the said alleged murder was committed is not within the boundaries of said reservation. By section 21 of said act all the lands of this Great Reservation outside of the several separate reservations were expressly restored to the public domain of the United States; the only exceptions being three islands in the Missouri river. Said section 13, for which Walking Eagle thereafter made application for a portion thereof as an allotment, and on which said offense was committed, was by the said act of 1889 made a part of the public domain, and was taken from out the limits and boundaries of an Indian reservation. It then ceased to be Indian country—Indian reservation—over which the United States had exclusive jurisdiction. By section 15 of said act Indians who had taken allotments prior thereto were protected in such allotments. This section had no possible application to the allotment of Walking Eagle, who had not then taken or made application for his allotment. Section 13 of said act of 1889 provided that Indians receiving and entitled to rations at either of the agencies mentioned in the act, but residing upon any portion of the said Great Reservation not included in either of the separate reservations herein established, may at his option within one year claim the land upon which he then resided as his allotment by recording his election with the proper agent at the agency to which he belongs, such allotment to conform in all other respects to the regular allotments. There is no evidence in the case at bar that Walking Eagle took his said allotment under this provision

of the law. Even if it did, it would only have the effect of further showing that his allotment was not within the limits and boundaries of the Cheyenne River Indian reservation. From the fact that it appears that Walking Eagle made application for said allotment at the local land office at Pierre, S. D., April 28, 1891, he must have acquired his said allotment either under section 4 of the act of February 8, 1887 (24 U. S. Statutes 389, 3 Fed. Stats. Annotated 494), or under section 4 of the act of February 28, 1891 (26 U. S. Stat. 795, 3 Fed. Stat. Annotated 501), by virtue of either of which acts an Indian might if he so desired procure an allotment on the government domain outside the boundaries of an Indian reservation.

[4] We are unable to find any decision holding that an offense committed by one Indian against another Indian on an Indian allotment upon the public domain outside the boundaries and limits of an Indian reservation, and within the limits of a state, is within the exclusive jurisdiction of the United States courts. Every decision cited by appellant is based upon the fact that the offense under consideration was committed by one Indian against another Indian within the boundaries and limits of an Indian reservation, over which the United States and the courts thereof have exclusive jurisdiction. The following cases are cited by appellant: Ex parte Crow Dog, 109 U. S. 556, 3 Sup. Ct. 396, 27 L. Ed. 1030; United States v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228; In re Gon-shayee, 130 U. S. 343, 9 Sup. Ct. 542, 32 L. Ed. 973; United States v. Celestine, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. 195; United States v. Sutton, 215 U. S. 291, 30 Sup. Ct. 116, 54 L. Ed. 200; State v. Columbia George, 39 Or. 127, 65 Pac. 604; State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169; Ex parte Cross, 20 Neb. 417, 30 N. W. 428; In re Blackbird (D. C.) 109 Fed. 139; United States v. Thomas, 151 U. S. 577, 14 Sup. Ct. 426, 38 L. Ed. 276. Not one of such decisions is directly in point in a case where the offense was committed by Indian against Indian outside the boundaries of the reservation. In the case of United States v. Kagama, the necessary inference to be drawn from the language of the court in

construing the act of Congress of March 3, 1885 (c. 341, 23 Stat. 362), is that an offense committed by one Indian against another Indian, not on the reservation, that the state court has jurisdiction; and that case has been frequently cited by courts of last resort as sustaining the jurisdiction of the state court. The same is true of the case of State v. Campbell. In this connection, see, also, State v. Howard, 33 Wash. 250, 74 Pac. 382, and State v. Smokalem, 37 Wash. 91, 79 Pac. 603. There are numerous decisions, both federal and state, sustaining the jurisdiction of the state courts in offenses committed by Indian against Indian not within the limits of the Indian reservation, but within the limits of the state. In Pablo v. People, 23 Colo. 134, 46 Pac. 636, 37 L. R. A. 636, the Supreme Court of Colorado in a well-considered case held that a tribal Indian killing a member of the same tribe while off the reservation is subject to be tried for the crime in the courts and according to the laws of the state within whose jurisdiction the crime was committed since the passage of the act of Congress of March 3, 1885. In that case appellant was an Indian charged with having killed another Indian. In re Wolf (D. C.) 27 Fed. 606, the court held that, where an Indian commits a crime outside the Indian country against another Indian, he is, like any other person, amenable to the criminal laws of the place where the crime is committed. In State v. Williams, 13 Wash. 335, 43 Pac. 15, a case where one Indian was charged with having murdered another Indian, it was held that an Indian who retains his tribal relations may be prosecuted in the courts of the state for offenses committed at a place not within the limits of an Indian reservation. In this connection, see, also, State v. Turner, 85 Cal. 432, 24 Pac. 857; State v. Howard, 33 Wash. 250, 74 Pac. 382; State v. Smokalem, 37 Wash. 91, 79 Pac. 603; 22 Cyc. 147; State v. Wolf, 13 Am. & Eng. Ann. Cas. note on page 193.

[5] It is contended that the state of South Dakota by the "Enabling Act" (Act Feb. 22, 1889, c. 180, 25 Stat. 676) disclaimed jurisdiction over Indian lands in favor of the jurisdiction of the United States. Section 4 of said act provides "that the people inhabiting the said proposed state agrees and declares that

it forever disclaims all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of Congress and the United States." It will be observed that by the express provision of this enabling act of February 22, 1889, the state of South Dakota only disclaimed jurisdiction over the Indian lands until the Indian title thereto shall have been extinguished by the United States. By the express terms of the title of the act of March 2, 1889, passed by the same legislative body eight days later, and by section 21 thereof, the Indian title to the land not included in the Indian reservations created thereby (excepting three islands), and which included the said section 13, on which the offense in question was committed, was extinguished, and the same restored to the public domain of the United States. When this portion of the former Great Reservation of the Sioux Nation thus became a part of the public domain with the Indian title thereto extinguished by the United States, it then became subject to the general jurisdiction of the state of South Dakota for the purpose of punishing criminal offenses committed thereon. The fact that thereafter some Indian might obtain an allotment of some portion thereof under the federal law permitting an Indian to acquire an allotment on the public domain off his reservation would not reinvest the United States with exclusive jurisdiction as to crimes committed by Indians generally on such an allotment. Neither would such fact constitute such an allotment a little quasi Indian reservation off by itself, and also thereby creating the possibility of having a great number of half a mile square little Indian reservations, all under the exclusive jurisdiction of the United States, scattered and intermixed all around over a county or counties of a state. We cannot believe that any such result was ever intended, but that all such allotments, so far only as the commission of offenses are concerned, are subject to the general laws and jurisdiction of the state courts just the same as any other public

domain within a state and not within the limits and boundaries of an Indian reservation.

The judgment or order appealed from is affirmed.