Ex parte VAN MOORE.

(District Court, D. South Dakota, S. D.   February 18, 1915.)

1. INDIANS �köö32—ALLOTTED LANDS—JURISDICTION OVER.

The treaty with the Sioux Indians of April 29, 1868 (15 Stat. 635), creating the Great Sioux reservation west of the Missouri river in the territory of Dakota, provided that no subsequent cession of any portion of the reservation by the tribe "shall be understood or construed in such manner as to deprive, without his consent, any individual member of the tribe of his rights to any tract of land selected by him." By Act March 2, 1889, c. 405, 25 Stat. 888, this Great reservation was divided. Smaller reservations were created for the different tribes of the Sioux Nation, and the remainder, with certain limitations, was restored to the public domain and opened to settlement. One of the limitations established by section 13 was that any Indian receiving and entitled to rations and annuities, but residing upon any portion of the Great reservation not included in any of the separate reservations thereby established, "may at his option within one year * * * have the allotment to which he would otherwise be entitled on one of said separate reservations upon the land where such Indian may then reside, such allotment in all other respects to conform to the allotments hereinbefore provided." Section 16 further provided that the acceptance of the act should be taken and held to be a release by those belonging to one band of all title to lands described in

⊙㎏⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

each of the other separate reservations, but that "this release shall not affect the title of any individual Indian to his separate allotment on land not included in any of said separate reservations provided for in this act, which title is hereby confirmed." *Held* that, under such treaty and act, an allotment duly selected by an Indian on land occupied by him outside of either of the separate reservations, and for which a trust patent was issued, retaining the legal title in the United States for 25 years, did not become a part of the public domain, but remained Indian land and a part of the "Indian country," exclusive jurisdiction over which is in the United States.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 4, 52, 53, 57, 58; Dec. Dig. ⊚⇒32.

For other definitions, see Words and Phrases, First and Second Series, Indian Country.]

2. INDIANS ⊚⇒10—LANDS—"INDIAN TITLE."

An Indian's right to occupancy of land, and that right recognized by the United States, constitutes "Indian title."

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 25, 29, 46; Dec. Dig. ⊚⇒10.

For other definitions, see Words and Phrases, Indian Title.]

3. INDIANS ⊚⇒38—CRIMES BY INDIANS IN INDIAN COUNTRY—JURISDICTION.

By section 2 of the Enabling Act of the state of South Dakota, the people inhabiting the proposed state forever disclaimed all right and title to all lands within the boundaries thereof "owned or held" by any Indian or Indian tribe, and agreed that "until the title thereto shall have been extinguished by the United States the same shall be and remain subject to the disposition of the United States and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States." *Held*, that lands within the state, formerly a part of an Indian reservation, and which have not been restored to the public domain open to settlement, but which are held by an Indian allottee under a trust patent, are Indian lands, over which the United States and its courts have exclusive jurisdiction, and that a state court is without jurisdiction to prosecute and sentence, under the state law, one tribal Indian for a crime committed against another on such lands.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 22, 64, 66; Dec. Dig. ⊚⇒38.]

4. HABEAS CORPUS ⊚⇒45—JURISDICTION OF FEDERAL COURTS—STATE PRISONER.

A federal court has power to discharge from imprisonment, on habeas corpus, an Indian convicted and sentenced by a state court which was without jurisdiction, and whose judgment is therefore void.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 38–45; Dec. Dig. ⊚⇒45.]

In the matter of the application of Francis Van Moore, for a writ of habeas corpus. Writ granted.

W. G. Porter, of Aberdeen, S. D., for petitioner.

Royal C. Johnson, Atty. Gen., for the State of South Dakota.

ELLIOTT, District Judge. The petition for a writ of habeas corpus filed in this court on the 24th day of September, 1914, alleged, in substance, that petitioner is unjustly and unlawfully detained and imprisoned in the South Dakota state penitentiary in the city of Sioux Falls, within this district, by O. S. Swensen, warden of said penitentiary, under and by virtue of warrant commitment, a copy of which

was set forth in the petition, and was entitled in the circuit court of the state of South Dakota, in and for Stanley county, in said state, and recited, in substance, that on the 12th day of July, 1900, the state's attorney and the petitioner, Francis Van Moore, with his attorney, came into that court, and, that being the day fixed by the court for 'the trial of said defendant upon the charge of murder, the said defendant in open court withdrew his plea of not guilty to the charge made in the information, and thereafter, in due form, entered his plea of guilty to the charge of murder, as charged in said information theretofore filed against him in that court, and thereupon, upon his plea of guilty, the court entered judgment and sentence against him, in substance, that the defendant be imprisoned in the state penitentiary at Sioux Falls, S. D., at hard labor, for and during the term of his natural life, commencing on the said 12th day of July, 1900, and thereupon committing the defendant to the custody of the warden of said penitentiary for compliance with said sentence.

The petition further shows that information was filed in the state's attorney's office within and for said county of Stanley, state of South Dakota, in the name and by authority of the state of South Dakota, charging the petitioner with the commission of the crime of murder, committed upon the person of Susan Tincup, an Indian, on the 14th day of May, 1900, within said county and state, stated fully and in legal terms.

The petition further alleges that upon said indictment the petitioner was duly arraigned and entered his plea of not guilty, and thereafter said plea was withdrawn and a plea of guilty entered, and that petitioner was sentenced by said court to be imprisoned in the state penitentiary at Sioux Falls, S. D., at hard labor, for and during the term of his natural life, commencing on the 12th day of July, 1900, and committing him until such sentence be complied with.

It is further alleged that under said sentence petitioner's term of imprisonment did in fact begin on the 12th day of July, 1900, and he has ever since that time and still is confined in the said state penitentiary at Sioux Falls, Minnehaha county, S. D., under and by virtue of said sentence and commitment, and that on May 17, 1913, an order was made by the Governor of the state of South Dakota, granting commutation of said sentence for life to the term of 40 years, beginning on the 12th day of July, A. D. 1900, and it was then ordered that said commuted sentence be considered in all respects as if it were the original sentence imposed by the court.

It is further alleged, in substance: That said sentence, as commuted, expires July 12, 1940, and, with good time allowance, the sentence would expire April 12, 1923. That the true name of the petitioner is Francis Van Moore, and that sentence was entered against him under the name of Van Francis Moore, but that Van Francis Moore and this petitioner, Francis Van Moore, are one and the same person.

The petition further alleges: That petitioner was born March 25, 1869, at the Cheyenne Indian reservation, in the state of South Dakota, where he resided continuously up to the date of his incarceration in the state penitentiary under the sentence hereinbefore described. That he is now, and at all times therein mentioned was, an Indian of

the Sioux Tribe of Indians inhabiting the country known as the Cheyenne Indian reservation, within the state of South Dakota. That he has never severed his tribal relations with said Cheyenne band of Sioux Indians, and has always been on the annuity rolls, and prior to his incarceration there was allotted to him, and still is allotted to him, horses and cattle and rations from the United States. That, at all times herein mentioned, he has been recognized, treated and regarded as an Indian belonging to said Cheyenne band of Sioux Indians. That on January 28, 1910, an allotment patent was issued by the United States in and to the following described property, to wit: South half of the southeast quarter, southeast quarter of the southwest quarter, and lot No. 4, of section 19, and the north half of the northeast quarter, northeast quarter of the northwest quarter, and lot No. 1, of section 30, township 17 north, range 23 east, containing 318.01 acres, setting forth therein a copy of the trust patent thereto, duly executed by Wm. H. Taft, President of the United States, whereby the United States of America allotted to Francis Van Moore the land above described, and thereby declared that it held and would continue to hold the land thus allotted, subject to all statutory provisions and restrictions, for the period of 25 years, in trust for the sole use and benefit of said Indian (this petitioner), and at the expiration of said period the United States would convey the same by patent to him in fee, discharged of said trust, and free from all charge and incumbrances whatsoever. That said allotment was subsequent to the act of Congress May 8, 1906 (34 Stat. L. 182, c. 2348 [Comp. St. 1913, § 4203]). That petitioner is not a citizen of the United States, but, on the contrary, is a ward of the government, and under the control and charge of the United States Indian agent of the Cheyenne Indian reservation when he was arrested and incarcerated in prison, and would now be, were it not for his incarceration and detention under said sentence.

It is further alleged, in substance: That Susan Tincup, the party alleged to have been killed by petitioner on the 14th day of May, 1900, at Bad River, in the county of Stanley, state of South Dakota, was an Indian by the name of Susan Tincup, an Indian of the Cheyenne band of the Sioux Tribe of Indians, and was a Sioux Indian under the charge and control of the government of the United States, was on the rolls at the Cheyenne Indian reservation, and prior to her death drew rations and was recognized as a member of the Sioux Tribe of Indians of the Cheyenne agency, and affiliated and associated with said band of Sioux Indians. That the offense charged against this petitioner was committed within the boundaries and limits of the former Great reservation of the Sioux Nation, and upon an allotment in Stanley county, S. D., but within the boundaries of said Indian reservation, and within the Indian country. That said allotment upon which said offense was committed was then, and now is, under the exclusive jurisdiction of the United States, and the courts of the United States, and that the said state court, sitting in and for Stanley county, S. D., did not have, on the 12th day of July, 1900, nor at any time prior thereto, jurisdiction over offenses committed on the said allotted land, hereinafter described as the allotted land of one Walking Eagle, an Indian

of said Sioux Tribe of Indians. That said offense was committed upon lands covered by his allotment, known as No. 58, describing the following lands, to wit: The southeast quarter of the northeast quarter and the west half of the southeast quarter of section 13, northeast quarter of the northeast quarter of section 24, township 4 north, range 30 east, lots Nos. 2, 3, and 4 of section 18, and lots Nos. 1 and 2 of section 19, township 4 north, range 31 east, containing 337.52 acres; the said land and allotment being known as the Walking Eagle allotment, lying within the Indian country, and the boundaries of the former Great reservation of the Sioux Tribes, in the then territory of Dakota, now South Dakota. That the application for said allotment was duly made to the Indian agent at the Cheyenne River agency and at the United States Land Office at Pierre, S. D., on April 28, 1891, and that thereafter, on June 20, 1891, an allotment certificate for said lands was duly issued to said Wambli-Mani, or Walking Eagle, as an Indian allotment, No. 37, and that thereafter an allotment patent was duly issued, a copy of which said allotment patent of said Walking Eagle is set forth in the petition, the same being a United States trust patent to this allotment, approved by the Secretary of the Interior July 9, 1909, describing the premises above named, and allotting the same to said Walking Eagle, the United States thereby declaring that it held the same subject to all statutory provisions and restrictions for the period of 25 years, in trust, for the sole use and benefit of said Walking Eagle, and that, at the expiration of said period, the United States would convey the same by patent to said Indian, in fee, discharged of said trust, and free from all charge and incumbrance whatsoever, if said Indian should not die before the expiration of said trust period, and, in the event that such Indian died before the expiration thereof, the Secretary of the Interior would ascertain the legal heirs of said Indian and either issue to them, in their name, a patent in fee for said land, or cause the same to be sold for the benefit of said heirs, as provided by law, which said patent was executed by Wm. H. Taft, President of the United States, on the 28th day of March, 1910.

The petitioner further alleged that his detention and imprisonment, as above set forth, is illegal, null, and void in that:

(1) The trial, conviction, and sentence in the circuit court of the Sixth judicial circuit in the state of South Dakota, in and for Stanley county, were illegal, null, and void.

(2) That the court which passed the said sentence was without the jurisdiction of the offense charged, and that the sole and exclusive jurisdiction thereof was in the United States District Court for the District of South Dakota, and not in the state court.

(3) That the offense in question was committed upon and within the boundaries of the Great reservation of the Sioux Nation and within the Indian country then and there under the exclusive and sole jurisdiction of the United States courts. That the said offense was committed upon an Indian allotment, to wit, the allotment of Walking Eagle, above referred to, and fully described in said petition, and that the title to said allotment is now and at all times mentioned in said petition was vested in the United States.

(4) That the court in passing said sentence and all the proceedings therein exceeded the limits of its jurisdiction both as respects the place and person. That the said court then and there had no jurisdiction whatsoever over the said Indian allotment and any offense committed thereon by one Indian against another Indian, and that any such offense committed thereon was then and is now within the sole and exclusive jurisdiction of the United States District Court for the District of South Dakota, and wholly without the jurisdiction of the state court of Stanley county, S. D.

(5) That said information was filed, conviction had, and sentence delivered under the laws of the state of South Dakota, and that said laws then and there, and at the time of the filing of said information and imposing said sentence, and at the time of the commission of the offense, had no application whatever to murder committed by one Indian of another Indian within the Indian country, but that said act and the punishment thereof was then and is now covered solely and exclusively by the laws of the United States.

Upon the return day, O. S. Swensen, warden of the state penitentiary of the state of South Dakota, made return to the writ of habeas corpus, in obedience thereto, certified and returned to the judge of this court that said petitioner, Francis Van Moore, was committed to his custody and is detained by virtue of a warrant of commitment of the presiding judge of the circuit court of Stanley county, S. D., directed to him, and annexed thereto a certified copy of such commitment, as his sole authority for detaining said petitioner, and which said commitment was in substance as above set forth.

On, to wit, October 1st, the return day of the writ, there was filed an agreed statement of facts as follows:

"It is hereby stipulated and agreed that the following facts are and shall be admitted by both parties for the purpose of, and on the trial of, this proceeding:

"I. That Francis Van Moore was born March 25, 1869, upon the Great reservation of the Sioux Nation, within the territory of Dakota, now the state of South Dakota, and was, and is, and at all times since has been, an Indian of the Sioux Tribe of Indians, belonging to the Cheyenne band of Sioux Indians, and as such has been, since the establishment thereof, upon the annuity rolls of the Cheyenne band of Sioux Indians, and receiving rations at the Cheyenne River agency. That on January 28, 1910, an allotment patent was issued by the United States to the said Francis Van Moore for the south half of the southeast quarter, the southeast quarter of the southwest quarter, and lot 4, of section 19, and the north half of the northeast quarter, and the northeast quarter of the northwest quarter, and lot 1, of section 30, in township 17 north of range 23 east of the Black Hills meridian, wherein the title to said land is held in trust, for the sole use and benefit of the said Francis Van Moore, by the United States, for the period of 25 years, such trust to expire with the expiration of such period, and, in the event of the death of said Francis Van Moore, fee patent to issue for the benefit of the heirs, as provided by law. That Francis Van Moore and Van Francis Moore are one and the same person, and that Francis Van Moore is the true name of the petitioner.

"II. That Susan Tincup was a Sioux Indian enrolled as a member of the Sioux Tribe of Indians of the Cheyenne River agency, receiving rations and annuities at the Cheyenne River agency.

"III. That Walking Eagle, or Wambli-Mani, was an Indian of the Cheyenne Sioux band. That there was allotted to the said Walking Eagle, or Wambli-Mani, pursuant to, and in conformity with, the provisions of the act of March

2, 1889 (25 Stat. L. 888, c. 405), and particularly under section 13 of said act, certain lands lying within the boundaries of the Great reservation of the Sioux Nation, designated as allotment 37, the patent thereto being in words and figures as follows, to wit: [Here follows a copy of the Indian allotment trust patent which is in the usual form.] The said lands were situated within the Great reservation of the Sioux Nation, as constituted prior to the act of Congress March 2, 1889 (25 Stat. L. 888), and were not within the boundaries of the Pine Ridge, Rosebud, Standing Rock, Cheyenne River, Lower Brule, or Crow Creek reservations, as defined in sections 1, 2, 3, 4, 5, and 6 of the act of Congress of March 2, 1889.

"IV. That Walking Eagle, at, prior, and subsequent to the 14th day of May, 1900, resided upon and occupied the lands described in said allotment patent.

"V. That on the 9th day of July, 1900, an information for murder against the said Francis Van Moore, under the name of Van Francis Moore, was duly filed at the July, 1900, term of the circuit court of the Sixth judicial circuit of the state of South Dakota, within and for Stanley county, a copy of which information was and is in words and figures as follows: [Here follows a copy of a good and sufficient information, entitled in the state circuit court of Stanley county, South Dakota, charging the petitioner, Van Francis Moore, with having murdered Susan Tincup at the time and place above set forth.]

"VI. That all acts alleged to have been committed by the said Francis Van Moore involved in said information, and in the commission of the offense with which he was then and there charged, were committed upon and within the boundary lines of that part of the allotment of the Indian, Walking Eagle, described as follows: The southeast quarter of the northeast quarter (S. E. ¼ N. E. ¼) of section thirteen (13) in township four (4) north of range thirty (30), east of the Black Hills meridian, and within the boundaries of the Great reservation of the Sioux Nation as constituted prior to the act of March 2, 1889 (25 Stat. L. 888).

"VII. That upon said information said Francis Van Moore was arraigned and pleaded not guilty. That thereafter, upon permission of the court, said plea of not guilty was withdrawn and a plea of guilty was entered to the information. That thereupon the said Francis Van Moore was sentenced by the court, under the name of Van Francis Moore, to be imprisoned in the state penitentiary at Sioux Falls, South Dakota, for and during the term of his natural life.

"VIII. That upon the sentence of the court a commitment was duly issued, in words and figures as follows, to wit: [Here follows commitment in due form and in substance as above stated.]

"IX. That thereafter, upon petition and application duly and regularly made, and upon notice duly given as provided by law, the sentence of the said Francis Van Moore was on the 17th day of May, 1913, commuted; such order of commutation being as follows: [Here follows order granting commutation of sentence, in due form.]

"X. That the said Francis Van Moore is being detained, held, and kept and imprisoned in the state penitentiary at Sioux Falls, South Dakota, by O. S. Swensen, warden of the state penitentiary, under and by virtue of the warrant of commitment and order of commutation, and not otherwise."

There was also thereafter, and before the determination of the issue herein, filed certified copies of certain letters and documents of the Department of the Interior, Office of Indian Affairs, showing that section 13 of the act of March 2, 1889, provided, among other things, that any Indian residing upon any portion of the Great Sioux reservation, not included in either of the separate reservations established by the act, might, at his option, within one year from the date when the act took effect, or within one year after he had been notified of his right of option, retain the lands upon which he so resided, and that the act went into effect February 10, 1890, same being 26 Stat. L. 1554.

Such documents showed that the said Walking Eagle exercised his

right of option to retain the lands above described, as well as the successive steps taken by the Indian Office and the General Land Office looking to the approval of that allotment.

It appeared therefrom: That Walking Eagle notified the Indian agent of the Cheyenne River Indian agency of his selection of these lands upon which he then resided, as his allotment, and that the proper local land office was from time to time informed of the different selections made by Indians, and that the agent of the Cheyenne River Indian reservation notified the land office at Pierre of the selection of Walking Eagle, and that the lands occupied by Walking Eagle, and above described, were and should be withheld for allotment purposes under section 13, pending the filing of formal applications. That after formal application was filed for the Walking Eagle allotment in the local land office at Pierre, having jurisdiction over the land, through the proper Indian agent, it was forwarded to the General Land Office and subsequently transmitted by that bureau to the Indian Office and made the basis of a schedule which was presented to the President for approval. That, subsequent to the approval of the schedule, one copy was furnished the Commissioner of the General Land Office in order that trust patents might be furnished for the selections listed in said schedule. Application in the case of Walking Eagle was dated April 28, 1891. That the schedule was approved July 9, 1909, and that a trust patent issued for the allotment under date of March 28, 1910.

There was furnished a copy of that portion of the schedule referring to the Walking Eagle allotment as No. 58 and setting forth the description the same as in the petition above referred to.

There is also a copy of letter transmitted by Hon. R. G. Valentine, Commissioner, transmitting the schedule of allotments, including the Walking Eagle allotment, and recommending that they be approved and that the Commissioner of the General Land Office be requested to cause patents to issue in the name of the respective allottees, including Walking Eagle.

There was also filed a certified copy of the records of the Department of the Interior, Office of Indian Affairs, showing that on February 20, 1890, a letter of instruction was addressed to Charles E. McChesney, United States Indian Agent, Cheyenne River agency, Ft. Bennett, S. D., forwarding him a thousand printed copies of a formal notice by the Secretary of the Interior, to all Indians of the Sioux Nation, entitled to have allotments under section 13 of the act of March 2, 1889, of their right of option in the premises. This notice is dated February 14, 1890, and directed the agent to cause said notice to be read and carefully explained to the Indians in council assembled for the purpose, at the earliest practicable date, and post a copy or copies thereof in a conspicuous public place at the agency and at such other places on the reservation as may conveniently serve the purposes of this notice and have a copy thereof placed in the hands of such of the Indians as shall express their desire to avail themselves of the rights and privileges conferred by the provisions of said act.

A certified copy of a further letter from the department to said In-

dian agent, dated February 26th, is filed, directing that record should be kept of applications for such allotments.

There was also a certified copy of a document, entitled "Notice," issued by the Department of the Interior, in substance, reciting the reservations made in the law of March 2, 1889, for the benefit of the individual Indians residing upon the Great Sioux reservation, outside of the boundaries of the diminished reservations, recognizing their right thereto, and informing them of the steps to be taken by them to secure the issuance of an allotment trust patent, and directing public notice to all by posting, and specific notice to individual Indians entitled to the benefits of the provisions of said statute.

Hon. Royal C. Johnson, Attorney General of the state of South Dakota, appeared in behalf of said warden of the penitentiary and contended:

(1) That the state circuit court of Stanley county, S. D., had jurisdiction over the offense for which the petitioner, Francis Van Moore, was tried and convicted and subsequently sentenced to imprisonment in the state penitentiary at Sioux Falls, S. D., and further that this contention was sustained in the Supreme Court of the state of South Dakota in the case of Ex parte Moore, 28 S. D. 339, 133 N. W. 817, Ann. Cas. 1914B, 648.

(2) Assuming that the state court had such jurisdiction, the law of comity should prevent interference by the federal courts with the petitioner, who is held under process of the state court.

(3) That it is a settled rule that a court having possession of a person cannot be deprived of the right to deal with such person until its jurisdiction is exhausted and no other court has the right to interfere with such custody.

(4) That it was not intended by Congress that federal courts should, by writs of habeas corpus, obstruct the ordinary administration of the state criminal laws in the state courts.

(5) Where a state court has exclusive jurisdiction to proceed in a criminal action and to exhaust the remedies therein, a federal court cannot, except in unusual circumstances, interfere with the custody by a state court of a prisoner under sentence therein, by discharging him from imprisonment on habeas corpus.

[1] The first contention of the learned Attorney General involves the real controversy here, and in this contention he admitted that he was sustained only in the opinion of the Supreme Court of this state in the case above referred to. Ex parte Moore, supra. It becomes important, therefore, to determine just what the situation was as presented to the state court. It was determined in that case, in substance, that the court will take judicial notice of the location of a section of land in a government survey. That the court will take judicial notice of the boundaries of Indian reservations within the state and which are not subject to its jurisdiction. That the act of Congress March 2, 1889 (25 Stat. 888, c. 405), dissolving the Great Sioux reservation, restored certain land (a part of the same being the land above referred to as the allotment of Walking Eagle) to the public domain. That section 13 of the said act of Congress provided that Indians residing on portions not included in the reservations therein established might

claim the land upon which they resided as an allotment. And the court thereupon held that the Act of Congress February 8, 1887 (24 Stat. 389, c. 119 [Comp. St. 1913, § 4198]), and the act of Congress February 28, 1891 (26 Stat. 795, c. 383 [Comp. St. 1913, § 4199]), also provided that an Indian might procure an allotment on the government domain outside of the boundaries of a reservation. The court thereupon held that the allotment of Walking Eagle was no longer Indian country reservation, over which the United States had exclusive jurisdiction, and the allotment of land to an Indian under any of the three statutes named would not change its character. The court specifically states at page 343 of 28 S. D., at page 819 of 133 N. W. (Ann. Cas. 1914B, 648):

"There is no evidence in the case at bar that Walking Eagle took his said allotment under this provision of the law (act of Congress 1889). Even if it did, it would only have the effect of further showing that his allotment was not within the limits and boundaries of the Cheyenne River Indian reservation. From the fact that it appears that Walking Eagle made application for said allotment at the local land office at Pierre, S. D., April 28, 1891, he must have acquired his said allotment either under section 4 of the act of February 8, 1887, or under section 4 of the act of February 28, 1891, by virtue of either of which acts an Indian might, if he so desired, procure an allotment on the government domain outside the boundaries of an Indian reservation."

It was conceded by the Attorney General, upon the return of this writ, that the record upon this hearing differs materially from the record before the Supreme Court of the state in that it is here stipulated, as a part of the agreed statement of facts:

"That there was allotted to said Walking Eagle, or Wamblt-Mani, pursuant to, and in conformity with, the provisions of the act of March 2, 1889 (25 Stat. L. 888), and particularly under section 13 of said act, certain lands lying within the boundaries of the Great reservation of the Sioux Nation, designated as allotment 37; the particular description being in words and figures as follows, to wit: [Here follows the trust patent in full.] The said lands were situated within the Great reservation of the Sioux Nation, as constituted under the act of Congress March 2, 1889 (25 Stat. L. 888), and were not within the boundaries of the Pine Ridge, Rosebud, Standing Rock, Cheyenne River, Lower Brule, or Crow Creek reservations, as defined in sections 1, 2, 3, 4, 5, and 6 of the act of Congress of March 2, 1889."

There is, in addition to the stipulation of agreed facts above set forth, the certified copies of certain records of the Indian Office of the Department of the Interior, conclusively showing that the patent to this land of Walking Eagle was actually issued to him pursuant to the provisions of section 13 of the act of Congress of 1889.

In the consideration of this issue, therefore, this record differs materially from the record that was presented to the Supreme Court of the state.

The conclusive and undisputed proof here is: That the trust patent to this land referred to as Walking Eagle's allotment was issued pursuant to the provisions of section 13 of the act of Congress of 1889. That it is a part of the Great Sioux Indian reservation, though lying outside of the boundaries of either of the diminished reservations that were established by act of Congress, approved March 2, 1889, which was enacted pursuant to treaty, and that at the time of the enactment

of said statute by Congress in 1889, and ever since that time, the Indian, Walking Eagle, resided upon the premises heretofore referred to as his allotment, and upon which the offense was committed by petitioner.

The learned court in re Ex parte Moore, supra, at page 344 of 28 S. D., at page 819 of 133 N. W. (Ann. Cas. 1914B, 648), proceeded:

"We are unable to find any decision holding that an offense committed by one Indian against another Indian, on an Indian allotment upon the public domain, outside the boundaries and limits of an Indian reservation, and within the limits of a state, is within the exclusive jurisdiction of the United States courts."

The court thereupon recites the list of cases that had been called to its attention, and proceeded:

"Not one of such decisions is directly in point in a case where the offense was committed by Indian against Indian outside the boundaries of the reservation."

The court having found that there was no evidence before it pointing out the particular act of Congress under which Walking Eagle had received this allotment, and evidently having in mind the provisions of the federal law theretofore referred to in the opinion, permitting an Indian to acquire an allotment on the public domain off his reservation, uses the following language:

"Under the federal law, permitting an Indian to acquire an allotment on the public domain off his reservation would not reinvest the United States with exclusive jurisdiction as to crimes committed by Indians generally on such an allotment. Neither would such fact constitute such an allotment a little quasi Indian reservation off by itself, and also thereby creating the possibility of having a great number of half a mile square little Indian reservations, all under the exclusive jurisdiction of the United States, scattered and intermixed all around over a county or counties of a state."

In re U. S. v. Pelican, 232 U. S. 442, 34 Sup. Ct. 396, 58 L. Ed. 676, the Supreme Court of the United States, speaking through Mr. Justice Hughes, in sustaining the jurisdiction of the United States District Court for the Eastern District of Washington of the offense of murder committed by one Indian against another, "in the Indian country, to wit, upon the allotment of one Agnes, an Indian, being lot 3 of section 26 and lot 9 of section 35, in township 40 north, of range 32, E. W. M., in the Northern Division of the Eastern District of Washington, said land being then held' in trust by the United States," etc., it was conceded that this indictment was based upon section 2145 of the Revised Statutes, which provides that the general laws "of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States * * * shall extend to the Indian country." In connection with the hearing upon a demurrer to the indictment, the parties stipulated that the land described in the indictment as the place of the crime had been allotted to the Indian named under the act of February 8, 1887, and the act in amendment and extension thereof, approved February 28, 1891 (both of which are referred to in the opinion of the Supreme Court of this state), and that this land was situated on that part of the Colville Indian reservation, which had been open to set-

tlement and entry by the act of Congress. The United States District Court below held that the allotment, not being within the boundaries of the diminished Indian reservation, was not a part of the Indian country, within the meaning of the statute, and sustained a demurrer to the indictment, and the government took the case to the Supreme Court of the United States upon a writ of error under the criminal appeals act of March 2, 1907. The inquiry in this case was whether, with respect to the part of the original reservation that is comprised in the described allotment, the United States had lost the jurisdiction which it formerly had. This reservation had been opened, and, with certain exceptions, the reservation was vacated and restored to the public domain, and it was provided that this tract should be opened to settlement and entry by the proclamation of the President and should be disposed of under the general laws applicable to the disposition of public lands in the state of Washington. The exceptions were made by Congress in order to care for the Indians residing on that portion of the reservation that was opened to settlement. Every such Indian was entitled to select therefrom 80 acres, which were to be allotted to the Indians in severalty. The title to the lands selected were to be held in trust for the benefit of the allottees, etc. The court in this case determines this issue in the following language:

"Although the lands were allotted in severalty, they were to be held in trust by the United States for 25 years for the sole use and benefit of the allottee, or his heirs, and during this period were to be inalienable. That the lands, being so held, continued to be under the jurisdiction and control of Congress for all governmental purposes, relating to the guardianship and protection of the Indians, is not open to controversy." 232 U. S. 447, 34 Sup. Ct. 398, 58 L. Ed. 676.

"The lands, which, prior to the allotment, undoubtedly formed part of the Indian country, still retain, during the trust period, a distinctively Indian character, being devoted to Indian occupancy under the limitations imposed by federal legislation. The explicit provision in the act of 1897, as to allotments, we do not regard as pointing a distinction, but rather as emphasizing the intent of Congress in carrying out its policy with respect to allotments in severalty, where these have been accompanied with restrictions upon alienation or provision for trusteeship on the part of the government. In the present case, the original reservation was Indian country simply because it had been validly set apart for the use of the Indians as such, under the superintendence of the government. * * * The same considerations, in substance, apply to the allotted lands which, when the reservation was diminished, were excepted from the portion restored to the public domain. * * * The lands remained Indian lands set apart for Indians under governmental care; and we are unable to find ground for the conclusion that they became other than Indian country through the distribution into separate holdings; the government retaining control. It is said that it is not to be supposed that Congress has intended to maintain the federal jurisdiction over hundreds of allotments scattered through territory, other portions of which were open to white settlement. But Congress expressly so provided with respect to offenses committed in violation of the act of 1897. Nor does the territorial jurisdiction of the United States depend upon the size of the particular areas which are held for federal purposes. Criminal Code, § 272 [Act March 4, 1909, c. 321, 35 Stat. 1142; Comp. St. 1913. § 10415]. It must be remembered that the fundamental consideration is the protection of a dependent people." 232 U. S. 449, 34 Sup. Ct. 399, 58 L. Ed. 676.

This decision of the Supreme Court of the United States is the last word upon the subject, and seems to put at rest all contention as to

Indian allotments being Indian country, and definitely determines that this allotment of Walking Eagle is, and at the time of the commission of the alleged offense was, Indian country.

It is suggested, however, that the facts in this case under consideration by the Supreme Court of the United States are not directly in point with the facts in the case at bar in this: That the land involved in that case was allotted to the Indian from the reservation, before it was opened to settlement. Hence the Indian character of the land was preserved after the opening of the reservation. And it is insisted that this distinction between these cases is of vital significance.

A determination of this question requires a review of the treaty concluded between the United States and the Indians April 29, 1868 (15 Stat. L. 635), ratified by the act of February 16, 1869, the proclamation issued February 24, 1869. This treaty affected the whole Indian territory located in the Dakotas west of the Missouri river. This treaty of 1868, by article 12, provided:

"No treaty for the cession of any portion or part of the reservation herein described, which may be held in common, shall be of any validity or force as against the said Indians, unless executed and signed by at least three-fourths of all the adult male Indians, occupying or interested in the same; and no cession by the tribe shall be understood or construed in such manner as to deprive, without his consent, any individual member of the tribe of his rights to any tract of land selected by him, as provided in article VI of this treaty."

By the act of March 2, 1889 (25 Stat. L. 888), proclaimed February 10, 1890 (26 Stat. L. 1554), part of this Great reservation theretofore established by treaty was divided among the different tribes of the Sioux Nation by separating it into the reservations therein named, including the Cheyenne River reservation, and the remainder, with certain limitations, was opened for settlement under the provisions of the Homestead Law.

The act of 1889 recognized the rights of the individual Indian residing upon any portion of this Great reservation, as shown by section 13, which provides:

"That any Indian receiving and entitled to rations and annuities at either of the agencies mentioned in this act at the time the same shall take effect, but residing upon any portion of said Great reservation not included in either of the separate reservations herein established, may, at his option, within one year from the time when this act shall take effect, and within one year after he has been notified of his * * * right of option in such manner as the Secretary of the Interior shall direct by recording his election with the proper agent at the agency to which he belongs, have the allotment to which he would be otherwise entitled on one of said separate reservations upon the land where such Indian may then reside, such allotment in all other respects to conform to the allotments hereinbefore provided."

It is further provided, by section 28 thereof:

"That this act shall take effect, only, upon the acceptance thereof and consent thereto by the different bands of the Sioux Nation of Indians, in manner and form prescribed by the twelfth article of the treaty between the United States and the said Sioux Indians concluded April 29, 1868, which said acceptance and consent shall be made known by proclamation by the President of the United States, upon satisfactory proof presented to him that the same has been obtained in the manner and form required by said twelfth article of said treaty, which proof shall be presented to him within one year from the

passage of this act, and upon failure of such proof and proclamation this act becomes of no effect and null and void."

The act actually took effect on February 10, 1890; the same being the date of the proclamation of the President (26 Stat. L. 1554).

Paragraph 6, on the first page of the proclamation last cited, provides:

"That any Indian receiving and entitled to rations and annuities at either of the agencies mentioned in this act at the time the same shall take effect, but residing upon any portion of said Great reservation not included in either of the separate reservations herein established, may, at his option, within one year from the time when this act shall take effect, and within one year after he has been notified of his said right of option in such manner as the Secretary of the Interior shall direct by recording his election with the proper agent at the agency to which he belongs, have the allotment to which he would be otherwise entitled on one of said separate reservations upon the land where such Indian may then reside."

The next to the last paragraph of the proclamation also provides:

"Warning is hereby also expressly given to all persons not to enter or make settlement upon any of the tracts of land specially reserved by the terms of said act, or by this proclamation, or any portion of any tracts of land to which any individual member of either of the bands of the Great Sioux Nation, or the Ponca Tribe of Indians shall have a preference right under the provisions of said act; and, further, to in no wise interfere with the occupancy of any of said tracts by any of said Indians, or in any manner to disturb, molest or prevent the peaceful" occupancy of any "tracts by them."

Section 16 of said act of March 2, 1889, further provided:

"That the acceptance of this act by the Indians in manner and form as required by the said treaty concluded between the different bands of the Sioux * * * Indians and the United States, April 29, 1868, and proclaimed by the President February 24, 1869, * * * hereinafter provided, shall be taken and held to be a release of all title on the part of the Indians receiving rations and annuities on each of the said separate reservations, to the lands described in each of the other separate reservations so created, and shall be held to confirm in the Indians entitled to receive rations at each of said separate reservations, respectively, to their separate and exclusive use and benefit, all the title and interest of every name and nature secured therein to the different bands of the Sioux Nation by said treaty of April 29, 1868. This release shall not affect the title of any individual Indian to his separate allotment on land not included in any of said separate reservations provided for in this act, which title is hereby confirmed," etc.

As has been heretofore stated, the agreed statement of facts and the certified records of the offices of the Indian Commissioner and Secretary of the Interior at Washington, presented with this application, conclusively show the residence and occupation of this tract by Walking Eagle, the selection by him made to the agent, and filed with the local land office at Pierre, S. D., for this particular tract of land and the issuance of patent therefor to said Walking Eagle as his allotment, under the provisions of section 13 of said act of Congress of 1889.

In addition to these proofs, the patent itself carries with it the presumption that all statutory prerequisites have been complied with (No Fire v. U. S., 164 U. S. 657–660, 17 Sup. Ct. 212, 41 L. Ed. 588), and such stipulation and certified copies affirm all the facts so presumed.

Reviewing this history of the treaty and the acts of Congress, it

seems clear to me that the right to possession and occupancy of the particular tracts upon which individual Indians resided, outside of the diminished reservations, was recognized first by the treaty of 1868, again by the act of Congress of 1889, again by the proclamation of the President of 1890, by the notice issued by the departments having charge of the administration of these laws, issued pursuant to the provisions of the proclamation, and by the issuance of the trust patent to these lands to this particular Indian, pursuant to section 13 of the law of 1889.

A casual reference to the various provisions of this treaty and these acts of Congress and the record made here must establish the fact that individual Indians had rights in lands situated upon the Great reservation, outside of the boundary lines of either of the diminished reservations, and the further fact that these rights could not be taken from the individual Indian without his consent. They were guaranteed him by the treaty which was in the act expressly confirmed, and by every act of Congress and every step taken by the officers of the government having the administration of the law, pursuant to the provisions of such treaty, and the Indian, Walking Eagle, by his occupation of the premises here described, under the said treaties and laws, acquired an individual right, as such Indian, to the possession and occupation of the particular premises described, and that such premises were specially reserved from the operation of the provisions of the law of 1889, opening the rest of the Indian country, outside of the diminished reservations, to settlement. Clearly his right to possession of, and to occupy, these premises, and that they were to be reserved to him and held in trust for him, and were not to be subject to the operation of the homestead laws of the United States, is indicated by the plain provisions of both the treaty and the congressional enactments.

And in this connection it may be of interest to consider what is meant by Indian title.

[2] I think it may be said with authority that the Indian's right of occupancy, and that right recognized by the government, is Indian title. This right of occupancy has always been held sacred, something not to be taken from him, except by his consent, and then only upon such considerations as should be agreed upon. Minn. v. Hitchcock, 185 U. S. 373–389, 22 Sup. Ct. 650, 46 L. Ed. 954; U. S. v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532; People ex rel. Cusdick v. Daly, Sheriff, 212 N. Y. 183, 105 N. E. 1048; U. S. v. Joseph, 94 U. S. 618, 24 L. Ed. 295; U. S. v. Celestine, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. 195; Hallowell v. U. S., 221 U. S. 317, 31 Sup. Ct. 587, 55 L. Ed. 750; Bates v. Clark, 95 U. S. 204, 24 L. Ed. 471; U. S. v. 43 Gals. of Whisky, 93 U. S. 188, 23 L. Ed. 846; Cherokee Nation v. Georgia, 5 Pet. 1–47, 8 L. Ed. 25; Johnson v. McIntosh, 8 Wheat. 543, 5 L. Ed. 681; U. S. v. Cook, 86 U. S. (19 Wall.) 591, 22 L. Ed. 210; Spalding v. Chandler, 160 U. S. 394, 16 Sup. Ct. 360, 40 L. Ed. 469.

As I view this record, the rights of individual Indians residing on lands outside of the separate reservations then established were reserved by section 13 of the act of Congress of March 2, 1889, and the clear

purpose was to open for settlement as much of the lands outside of the separate reservations as was not occupied by the individual Indians.

In harmony with this plan, there was no cession to the United States by these individual Indians residing on lands outside of the diminished reservations of their rights to the lands upon which they resided. The cession under the terms of the treaty expressly excepted the lands so occupied from the operation of the treaty, and the exception ceased to be operative as to any particular lands occupied by any particular Indian, only by his abandonment and his failure to apply for the allotment to the proper Indian agent and the filing of the list by such Indian agent in the local land office, that the patent might issue by the proper officers of the government.

I repeat that the Act of March 2, 1889, contained the provision:

"This release shall not affect the title of any individual Indian to his separate allotment on land not included in any of said separate reservations provided for in this act, which title is hereby confirmed," etc.

The lands that were by section 21 of the act of 1889 restored to the public domain and opened for settlement under the Homestead Law did not include the lands upon which this individual Indian, Walking Eagle, resided, and which were occupied by him at the time the act went into effect, to which he had an exclusive right of possession, except in the event he should waive his right by failing to elect, as provided by section 13.

This was the chief limitation to which the President in his proclamation February 10, 1890, had reference, when he said "subject to all the conditions and limitations in said act contained," etc.

It is my judgment that instead of Walking Eagle's title to the land in question, his right of occupation, his right of possession, being in any manner disturbed or changed or extinguished by the act of March 2, 1889, that which had been theretofore preserved to him was by that act confirmed.

[3] The enabling act of the state of South Dakota February 22, 1887, and the act of March 2, 1889, approved within less than ten days of each other, were drafted together in contemplation of these conditions. By section 2 of the Enabling Act of the state of South Dakota, the people inhabiting the proposed state forever disclaimed all right and title to all lands within the boundaries thereof "owned or held by any Indian or Indian tribe; and until the title thereto shall have been extinguished by the United States the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States," etc. The title of the United States to these lands is not extinguished, within the meaning of this paragraph, until the United States grants the same by final patent in fee. U. S. v. Rickert, 188 U. S. 432–441, 23 Sup. Ct. 478, 47 L. Ed. 532.

In view of the fact that allotments had been made to individual Indians over a large area outside of the diminished reservations within the state of South Dakota, and those that were contemplated to be made in the future, to avoid doubt on the subject could be the only object of this otherwise meaningless clause.

The word "reservation" is not used. The provision is not made that the Indian "reservation," but the Indian "lands," shall remain, etc., and the lands are not limited to those of an Indian tribe, but include also those that are held or owned by any Indian.

It is manifest that Indian lands, or the lands of an Indian within a reservation or on the public domain, all come in the same category, all such lands are equally Indian country, and, if so, no state court had jurisdiction to try or sentence the petitioner upon the charge of committing the crime of murder of one Indian by another on this tract of land. U. S. v. Pelican, 232 U. S. 442, 34 Sup. Ct. 396, 58 L. Ed. 676.

In my judgment upon the record here, it is not necessary to go to the extent of the opinion in re Donnelly v. U. S., 228 U. S. 243, 33 Sup. Ct. 449, 57 L. Ed. 820, Ann. Cas. 1913E, 710, in substance, that an Indian reservation which is created out of a portion of the public domain, without previous recognition of any Indian title thereto, is "Indian country."

I am of the opinion that this allotment of Walking Eagle—

(1) Was a part of the Great Sioux Indian reservation, included within the provisions of the treaty of 1868.

(2) That the particular lands included within the allotment of Walking Eagle were resided upon and occupied by him at and prior to the act of Congress of 1889.

(3) That, under and by virtue of the provisions of the treaty of 1868, the act of Congress of 1889, and the acts of the officers of the United States in the administration of the law, there was an expressed purpose and intent to preserve the title, right to the possession, and occupancy of the individual Indian to the premises upon which he resided.

(4) That the government of the United States never secured any right, title, or interest in and to the premises described as the allotment of Walking Eagle, except to hold the same in trust for him as his allotment, and it never became any part of the public domain for the purpose of settlement by citizens of the United States.

(5) That the Great Sioux reservation, including all of that country west of the Missouri river in the two Dakotas, was originally Indian country, by virtue of the right of the Indian to occupy the same, and that right recognized by the government of the United States, and such right of occupancy has been preserved and recognized by the treaties and acts of Congress above referred to, to the individual allotments of Indians under the provisions of the act of Congress of March, 1889, and such allotments have been specifically excepted from the operation of that portion of said statutes opening the same to public settlement.

(6) By the treaty and said act of Congress there has been a continuous recognition of the Indian title and right of occupation of Walking Eagle to the premises in question, and I am therefore convinced that, ever since the treaty of 1868, it has been and now is "Indian country." That the United States has the exclusive jurisdiction of offenses committed by an Indian against an Indian within the Indian

country is a proposition conceded upon this hearing, and is so well settled that it needs no citation of authorities.

It follows that the state court of Stanley county, S. D., had no jurisdiction of the offense of murder alleged to have been committed by the petitioner, an Indian, of Tincup, an Indian, at the time and place named in the information, within the Indian country.

This determines the first and main contention of the Attorney General in this case, and at the same time disposes of the second, as that involved an assumption that the state court had jurisdiction.

The third contention of the learned Attorney General, that a court having possession of a person cannot be deprived of the right to deal with such person until its jurisdiction is exhausted, has no application where it is without jurisdiction.

[4] The contention of the learned Attorney General that it was not intended by Congress that federal courts should, by writs of habeas corpus, obstruct the administration of the state criminal laws in the state courts, is answered by the determination of this first contention, that the exclusive jurisdiction of the offense charged was within the courts of the United States. Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734, 29 L. Ed. 868; Ex parte Bridges, 2 Woods, 428, Fed. Cas. No. 1,862; Ex parte Lange, 18 Wall. 163, 21 L. Ed. 872; Ohio v. Thomas, 173 U. S. 276, 19 Sup. Ct. 453, 43 L. Ed. 699; In re Loney, 134 U. S. 372, 10 Sup. Ct. 384, 33 L. Ed. 949; In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55.

I am of the opinion that the state court was without jurisdiction to hold any hearing or make any determination in the premises, and that the order of the state court directing the petitioner's imprisonment was and is void, as distinguished from being irregular, and therefore that petitioner is held in the custody of the authorities of the state penitentiary of the state of South Dakota under illegal process. It further satisfactorily appearing that the defendant has been imprisoned thereunder for nearly 15 years, the recent determination of the questions here involved by the Supreme Court of the United States in re U. S. v. Pelican, supra, at variance with the rule announced by the Supreme Court of the state on denying his application for a release, constitutes exceptional circumstances, and justifies the issuance of the writ by this court and the discharge of the petitioner.

The court, having reached the foregoing determination as to the facts of the case, further finds that law and justice require that an order be entered granting the petition, liberating the defendant, and discharging him from custody.