[Crim. No. 5667. In Bank. Aug. 2, 1957.]

In re RAYNA TOM CARMEN, on Habeas Corpus.

Mason A. Bailey and Leonard J. Bloom for Petitioner.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Arlo E. Smith, Deputy Attorney General, for Respondent.

SPENCE, J.—Petitioner, Rayna Tom Carmen, is confined in the state prison at San Quentin under judgments of conviction of first degree murder and of assault with intent to commit murder. He seeks his release from custody upon alleged jurisdictional grounds.

Petitioner was first convicted of the two offenses in the Superior Court of Madera County in 1950. Wilbur Dan McSwain was the victim of the murder and Alvin McSwain was the victim of the assault. The crimes were committed near the home of the victims. The initial altercation between the parties had occurred earlier the same morning at a point in Madera County some miles distant from the scene of the crimes. After that altercation petitioner had driven to his home, had obtained a gun, and had then driven to the home of the victims to await their return. The shooting occurred immediately following their return, while Alvin McSwain was still in an automobile and Wilbur Dan McSwain was standing near it.

At the first trial it was alleged and proved that the crimes had been committed in Madera County. Petitioner was convicted of both offenses and was sentenced to imprisonment for the term prescribed by law on the assault count and to suffer the death penalty on the murder count. Upon appeal, this court affirmed the assault conviction and reversed the murder conviction. (*People* v. *Carmen*, 36 Cal.2d 768 [228 P.2d 281].)

At the second trial in the Superior Court of Madera County petitioner was again convicted of first degree murder for the killing of Wilbur Dan McSwain and was again sentenced to suffer the death penalty. It was again alleged and proved that the murder had been committed in Madera County.

At the time of oral argument before this court on the appeal

from the second murder conviction, it was suggested for the first time that facts might be adduced showing that the murder had been committed on a small tract of land within Madera County known as an "Indian allotment," that such allotment constituted "Indian country," and that petitioner was an "Indian," within the meaning of those terms as used in certain federal statutes, with the result that exclusive jurisdiction over the offense might be vested in the federal courts. (See 18 U.S.C.A. §§ 1151, 1152, 1153, and 3242, as amended May 24, 1949.) Petitioner thereupon filed an application to produce on the appeal additional evidence relating to the newly suggested facts. This court denied the application and affirmed the second judgment of conviction. (*People* v. *Carmen,* 43 Cal.2d 342 [273 P.2d 521].) Noting that the facts shown in the trial court record were insufficient to show exclusive jurisdiction in the federal courts, this court stated that "Since the defendant committed the crime in a county of this state, it may not be assumed that any special circumstances existed which would deprive the state of jurisdiction." (P. 349.)

Thereafter petitioner commenced this habeas corpus proceeding, claiming a lack of jurisdiction in the courts of this state on the basis of allegations that he and the McSwains were "Indians" and that the murder and the assault had been committed in "Indian country." Because of the alleged jurisdictional questions involved, this court issued a writ of habeas corpus and made an order of reference for the purpose of determining the status of petitioner and Wilbur Dan McSwain, as well as the locus of the crimes. Hearings were conducted and the referee filed his findings with this court.

The People contend that the evidence is insufficient to sustain the referee's findings concerning the status of petitioner and Wilbur Dan McSwain. Upon further consideration, however, we have concluded that it is unnecessary to determine the sufficiency of the evidence to support the referee's findings or the adequacy of said findings. We have reached this conclusion because we are of the opinion that in the absence of exceptional circumstances, which are not present here, petitioner may not contest, in this collateral attack upon the final judgments of conviction, the trial court's determination and exercise of jurisdiction, upon the basis of new and additional facts which do not appear in the trial court record.

 We are here concerned with the nature of the inquiry which may be made on habeas corpus where it is claimed that

a trial court of general jurisdiction lacked jurisdiction over an offense by reason of the status of the parties involved and the place at which the crime occurred Traditionally the inquiry on habeas corpus has been limited to an examination of facts appearing upon the face of the record and no evidence dehors the record has been received to impeach the judgment. (*In re Selowsky,* 189 Cal. 331 [208 P. 99] ; *In re Stevenson,* 187 Cal. 773 [204 P. 216] ; *In re Nicholson,* 24 Cal.App.2d 15 [74 P.2d 288] ; *In re Mirando,* 15 Cal.App.2d 443 [59 P.2d 544] ; *In re Murphy,* 79 Cal.App. 64 [248 P. 1044] ; *In re Ballas,* 53 Cal.App. 109 [199 P. 816] ; *In re Todd,* 44 Cal.App. 496 [186 P. 790] ; see also 39 C.J.S., Habeas Corpus, § 16, p. 456.) However, it was said in *In re Connor,* 16 Cal.2d 701, 712 [108 P.2d 10], that "[t]he scope of inquiry on *habeas corpus* in this state may . . . under exceptional circumstances, extend over the entire course of proceedings in the lower courts . . . and may embrace additional evidence received by this court either directly or under an order of reference."

The scope of inquiry has been so extended in instances where a petitioner has contested the validity of a final judgment of conviction upon the ground that he had been denied the aid of counsel (*In re Connor, supra,* 16 Cal.2d 701) ; or that his conviction had been secured solely by perjured testimony knowingly used by prosecuting officials (*In re Mooney,* 10 Cal. 2d 1 [73 P.2d 554] ) ; or that the law under which he had been convicted was unconstitutional (*In re Bell,* 19 Cal.2d 488 [122 P.2d 22] ).

The asserted grounds of claimed lack of jurisdiction in the instant case, however, do not appear to be of such nature as would warrant a departure from the traditional scope of inquiry or would permit the consideration of new and additional facts alleged by petitioner which do not appear in the trial court record. The situation here presented is not one in which the asserted lack of jurisdiction is based upon a claim by petitioner that he was convicted of violating an unconstitutional law or was denied any fundamental constitutional right. (See *In re Bell, supra,* 19 Cal.2d 488, 501-502.) On the contrary, petitioner's claims are based entirely upon federal statutes (18 U.S.C.A. §§ 1151, 1152, 1153, and 3242), the effect of which has been changed since petitioner committed his offenses, by legislation giving the courts of this state unquestioned jurisdiction over offenses committed in "All Indian country within the state." (18 U.S.C.A. § 1162, as amended Aug. 24, 1954.)

 Petitioner had the opportunity to raise the jurisdictional question here involved by presenting the alleged facts at his trials. He failed to do so and, upon the facts there alleged and proved, the trial court's implied determination that it had jurisdiction over the offenses was correct. To permit petitioner to now relitigate that issue would encourage defendants charged with crimes, the jurisdiction over which might depend upon complex factual determinations, to withhold the raising of those issues until after they had attempted to obtain a favorable result at a trial on the merits, and perhaps until such time as a conviction by the court claimed to have jurisdiction would be impossible by reason of the statute of limitations, or otherwise. (See *Ex parte Wallace, infra,* 81 Okla. Crim. 176 [162 P.2d 205].) The sanction of such procedure would permit piecemeal litigation of factual issues which should be finally determined upon a single trial.

 Federal jurisdiction over offenses which are committed within the boundaries of this state and which are defined by state law is exceptional and, in trials in the courts of this state, such jurisdictional claims are ordinarily defensive matter. (See *People* v. *Collins,* 105 Cal. 504, 509 [39 P. 16].) Petitioner therefore should have alleged and proved in the trial court any facts which he now claims might have had the effect of vesting exclusive jurisdiction in the federal courts.

The foregoing conclusions are supported by both state and federal authority. In *State* v. *Utecht,* 220 Minn. 431 [19 N.W.2d 706, 161 A.L.R. 1316], and *Ex parte Wallace, supra,* 81 Okla Crim. 176 [162 P.2d 205], the problem presented was almost identical with that involved here. Petitioners therein by collateral attack on habeas corpus attempted for the first time to contest the jurisdiction of the state courts of general jurisdiction which had convicted them. It was claimed that petitioners were "Indians" and that the crimes of which they had been convicted had been committed in "Indian country." Relief was denied in both cases upon the ground that the determination of jurisdiction by a trial court of general jurisdiction was not subject to collateral attack on habeas corpus where petitioners had not contested the jurisdiction of the court at the trial nor brought to the trial court's attention facts from which lack of jurisdiction could have been determined, and where upon the face of the trial court record there was no showing of lack of jurisdiction. (See also 39 C.J.S., Habeas Corpus, § 16, p. 456; 25 Am.Jur., Habeas Corpus, § 26, p. 161.) While in neither of the cited cases did peti-

tioner attempt to raise the jurisdictional question upon appeal as was done in the instant case, the attempt herein, as heretofore noted, was unsuccessful. (*People* v. *Carmen, supra,* 43 Cal.2d 342.) That factor, therefore, would not appear to be a distinguishing one.

On numerous occasions the federal courts have likewise held that a final judgment of conviction may not be attacked on habeas corpus upon allegations of new and additional facts claimed to show that the convicting court lacked jurisdiction over the offense because of the alleged status of the parties or the alleged place where the crime was committed, at least when there was no affirmative showing of lack of jurisdiction upon the face of the trial court record. (*Toy Toy* v. *Hopkins,* 212 U.S. 542 [29 S.Ct. 416, 53 L.Ed. 644] ; *Davis* v. *Johnston,* 144 F.2d 862; *Hatten* v. *Hudspeth,* 99 F.2d 501; *Ex parte Savage,* 158 F. 205; see also *Rodman* v. *Pothier,* 264 U.S. 399 [44 S.Ct. 360, 68 L.Ed. 759] ; *In re Lincoln,* 202 U.S. 178 [26 S.Ct. 602, 50 L.Ed. 984] ; *Walsh* v. *Johnston,* 115 F.2d 806; *Walsh* v. *Archer,* 73 F.2d 197; *Archer* v. *Heath,* 30 F.2d 932; *United States* v. *Lair,* 195 F. 47 [115 C.C.A. 49].)

Certain of the cited federal cases involved petitioners claiming that the federal courts which had convicted them lacked jurisdiction because the petitioners therein were "allotted Indians" and no longer wards of the government (*Toy Toy* v. *Hopkins, supra; Ex parte Savage, supra*), or that the locus of the crime was no longer "Indian country" (*Toy Toy* v. *Hopkins, supra; Davis* v. *Johnston, supra; Hatten* v. *Hudspeth, supra*). In each instance the court refused to redetermine the question of jurisdiction. Moreover, the refusal was not made dependent upon whether the jurisdictional issue had been raised at the trial or whether at the time of trial petitioner was aware of the facts upon which the alleged lack of jurisdiction was later asserted. Thus in *Davis* v. *Johnston, supra,* 144 F.2d 862, it was said: "In appellant's petition he states that he did not object to the jurisdiction of the court in the trial of the criminal case for the reason, he now alleges that he was not aware of the fact that the store building in which the crime was committed was not within the reservation. The decision of the court in the criminal case upon the factual question of jurisdiction is equally conclusive whether or not it was raised by the defendant."

The case of *Tooisgah* v. *United States,* 186 F.2d 93, is not helpful to petitioner. There an Indian sought redetermination of the trial court's jurisdiction by a motion to vacate under

section 2255, title 28, United States Code Annotated. The court, one judge dissenting, reexamined the question of jurisdiction, found as a matter of law that it was lacking, and directed that the judgment be vacated. The court was careful, however, to distinguish two of the above cited cases, stating at pages 95-96: "Unlike *Hatten* v. *Hudspeth*, 10 Cir., 99 F.2d 501, and *Davis* v. *Johnston*, 9 Cir., 144 F.2d 862, no new or additional facts are sought to be injected into the case, and no adjudicated facts are sought to be impeached." It appears clear from the quoted language that the present case is likewise distinguishable, since we determined on the second appeal (*People* v. *Carmen, supra,* 43 Cal.2d 342) that there were no facts in the trial court record which showed lack of jurisdiction in the trial court. Petitioner's claim is therefore wholly dependent upon new and additional facts which he seeks to inject into this proceeding as the basis for his collateral attack. Under the rule established by the numerous state and federal decisions, such collateral attack is not permitted under the circumstances; and if there may be said to be anything in the opinions in *State* ex rel. *Irvine* v. *District Court,* 125 Mont. 398 [239 P.2d 272], or *Application of Andy,* 49 Wn.2d 449 [302 P.2d 963], which lends support to petitioner's position, it is to that extent out of harmony with the established rule and should not be followed.

The established rule was clarified but not modified in *Bowen* v. *Johnston,* 306 U.S. 19, 27 [59 S.Ct. 442, 83 L.Ed. 455], where it was said that the traditional limitations on inquiry on habeas corpus may, in some situations, "yield to exceptional circumstances where the need for the remedy afforded by the writ of *habeas corpus* is apparent." The court there determined that the important and unanswered conflict then existing between federal and state authorities concerning the purely legal question of their respective claims to jurisdiction over a national park constituted such "exceptional circumstances."

The trial court record there showed that the murder had been committed "on the Government Reservation known as the Chickamauga and Chattanooga National Park within the exterior limits of the State of Georgia" (p. 21); and "The sole question was whether this Park was within the exclusive jurisdiction of the United States" (p. 23). The question of jurisdiction was therefore a "question of law" (p. 27) rather than of fact, as it depended solely "upon the terms of the consent or cession given by the legislature of Georgia," of

which the court took "judicial notice." (P. 23.) The court there determined as a matter of law that the federal court had jurisdiction and it affirmed the judgment of the Circuit Court, which affirmed the judgment of the District Court denying the petition for habeas corpus. No attempt had been made in that case to present any new or additional facts concerning jurisdiction in the habeas corpus proceeding. The court there merely found "exceptional circumstances" to justify its determination on habeas corpus of an important question of law following a final judgment of conviction. The discussion in that case of the decisions in *Toy Toy* v. *Hopkins, supra,* 212 U.S. 542, *Rodman* v. *Pothier, supra,* 264 U.S. 399, and *Walsh* v. *Archer, supra,* 73 F.2d 197, clearly shows that the court did not intend to modify the general rule established by those decisions. (See *Davis* v. *Johnston, supra,* 144 F.2d 862, 863.)

Similarly, the case of *Ex parte Van Moore,* 221 F. 954, was found to present "exceptional circumstances" in that long after petitioner's conviction in the state court of South Dakota, the United States Supreme Court had determined as a matter of law, contrary to the prior determinations of the courts of South Dakota and other jurisdictions, that Indian allotments held in trust outside of Indian reservations had at all times been within the meaning of "Indian country" as that term was used in the federal statutes. As the court said at page 971, " [T]he recent determination of the questions here involved by the Supreme Court of the United States in re *U.S.* v. *Pelican, supra* [232 U.S. 442 (34 S.Ct. 396, 58 L.Ed. 676)], at variance with the rule announced by the Supreme Court of the state on denying his application for a release, constitutes exceptional circumstances, and justifies the issuance of the writ. . . ." It is apparent that the instant case involves no such exceptional circumstances as were present in *Bowen* v. *Johnston, supra,* and *Ex parte Van Moore, supra.*

Contrary to petitioner's claim the cases of *In re Seeley,* 29 Cal.2d 294 [176 P.2d 24], and *In re McVickers,* 29 Cal.2d 264 [176 P.2d 40], lend no support to his position. Neither of these cases involved an attack upon a final judgment of conviction but were concerned only with the question of habitual criminal status. This court recognized the distinction when it said in *In re Seeley, supra,* at page 299, in referring to the decision in *In re McVickers, supra:* "In that case it was held that an adjudication of habitual criminal status is not a judgment of conviction but is, in effect, only an

ancillary and severable determination of a fact pertinent to the length of imprisonment and right to parole, and hence that such determination is not necessarily characterized by the high degree of finality of a final judgment of conviction.''

The federal courts have distinguished, as we have here, between habeas corpus proceedings involving claims of lack of jurisdiction upon grounds similar to those here involved and those wherein a petitioner has contested jurisdiction on the ground that he was denied due process of law at his trial. Thus while the federal courts, as appears from the cited authorities, have consistently refused to redetermine questions of status of the parties or the locus of the crime on the basis of facts not appearing on the face of the trial court record, they have shown a willingness to look to evidence dehors the record where a petitioner has claimed that he has been denied his fundamental constitutional rights. (See *Johnson* v. *Zerbst,* 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357] ; *Mooney* v. *Holohan,* 294 U.S. 103 [55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406] ; *Moore* v. *Dempsey,* 261 U.S. 86 [43 S.Ct. 265, 67 L.Ed. 543] ; *Frank* v. *Mangum,* 237 U.S. 309 [35 S.Ct. 582, 59 L.Ed. 969] ; see also *United States* ex rel. *McCann* v. *Adams,* 320 U.S. 220 [64 S.Ct. 14, 88 L.Ed. 4] ; *Waley* v. *Johnston,* 316 U.S. 101 [62 S.Ct. 964, 86 L.Ed. 1302].)

It therefore appears that both reason and authority support the view that no exceptional circumstances are presented here and that our inquiry in this proceeding is limited to the record of the trial court in which the final judgments of conviction were entered. Having concluded that we may not here consider new and additional facts concerning the jurisdiction of the Superior Court of Madera County over the offenses of which petitioner was convicted, it follows that petitioner's allegation are insufficient to entitle him to any relief in this proceeding.

The writ is discharged and petitioner is remanded to custody.

Gibson, C. J., Shenk, J., and McComb, J., concurred.

CARTER, J.—I dissent.

The conclusion reached by the majority here is predicated upon the assumption that the scope of review on habeas corpus in a case such as this is limited to matters appearing upon the face of the record and that a reviewing court may not

consider pertinent facts *aliunde* the record even though such facts are conclusively established and it appears beyond doubt that the tribunal whose judgment is subject to review was without jurisdiction to hear and determine the cause and render the judgment which is the subject of review in the habeas corpus proceeding. In so holding the majority has ignored or misapplied several recent decisions both by this court and by the Supreme Court of the United States in which relief was obtained by means of habeas corpus where the inquiry extended beyond the record on which the judgment subject to review was based.

The most recent of these cases is that of *Chessman* v. *Teets*, 354 U.S. 156 [77 S.Ct. 1127, 1 L.Ed.2d 1253], decided by the Supreme Court of the United States on June 10, 1957. The background of the Chessman case should be well known to every member of this court. It will be remembered that on the 21st day of May, 1948, Chessman was found guilty of 17 felonies by a jury in the Superior Court of Los Angeles County and on June 25, 1948, sentence of death was pronounced against him. The court reporter who reported the proceedings at the trial died after only 646 out of 1,810 pages of the trial transcript had been dictated into a recording machine. Thereafter the deputy district attorney who prosecuted Chessman arranged with one Stanley Fraser who was an uncle of the wife of the said deputy district attorney to transcribe the remaining notes of the deceased reporter. The purported transcription of these notes extended over several months and finally a purported record was submitted to the trial court, and in the absence of Chessman or his counsel, testimony was offered on behalf of the prosecution with respect to the accuracy of said record which was finally approved by the trial judge. The proceedings for the settlement of said record were attacked by Chessman before both the trial court and this court, but this court affirmed the order of the trial court on May 19, 1950, with two justices dissenting (*People* v. *Chessman*, 35 Cal.2d 455 [218 P.2d 769, 19 A.L.R.2d 1084]). Thereafter the case was presented to this court on the record so approved and the judgment of death pronounced against Chessman was affirmed with the same two justices dissenting (*People* v. *Chessman*, 38 Cal.2d 166 [238 P.2d 1001]). Petition for certiorari to the Supreme Court of the United States was thereafter denied (*Chessman* v. *California*, 343 U.S. 915 [72 S.Ct. 650, 96 L.Ed. 1330]). Thereafter, and on July 16, 1954, Chessman presented to this court

a petition for a writ of habeas corpus on the ground that he was denied due process of law because of fraud perpetrated by the prosecution in the transcription and settlement of said record, alleging in his said petition certain facts which were not known to him at the time the other proceedings above mentioned were before this court. This court denied said petition on July 21, 1954, and certiorari to the Supreme Court of the United States was later denied without prejudice to Chessman applying for a writ of habeas corpus to a federal district court (*Chessman* v. *California*, 348 U.S. 864 [75 S.Ct. 85, 99 L.Ed. 681]). He later applied to the United States District Court for the Northern District of California, Southern Division, alleging substantially the same facts which were contained in his application for habeas corpus to the Supreme Court of California. This application was summarily denied by Judge Goodman of the United States District Court, and his decision was affirmed by the United States Court of Appeals for the 9th Circuit (*Chessman* v. *Teets*, 221 F.2d 276). The Supreme Court of the United States thereafter reversed the 9th Circuit Court of Appeals and Judge Goodman and directed that Chessman be given a hearing on his application (*Chessman* v. *Teets*, 350 U.S. 3 [76 S.Ct. 34, 100 L.Ed. 4]). He was thereafter given a hearing by Judge Goodman who denied him any relief and Judge Goodman's decision was affirmed by the United States Court of Appeals for the 9th Circuit, one judge dissenting (*Chessman* v. *Teets*, 239 F.2d 205). Thereafter the Supreme Court of the United States granted a writ of certiorari to the United States Court of Appeals for the 9th Circuit, and on June 10, 1957, reversed the decision of the 9th Circuit Court of Appeals and Judge Goodman, holding squarely that Chessman had been denied due process of law by the proceeding in the trial court which purported to settle the record on which this court affirmed his conviction. The effect of this decision is to render null and void, not only Judge Goodman's decision, but the order of the state trial court approving the trial record and all of the decisions of this court in denying Chessman relief.

In its opinion the Supreme Court of the United States declared: "On October 17, 1955, this Court, reversing the Court of Appeals, remanded to the District Court for a hearing petitioner's application for a *writ of habeas corpus*, charging fraud in the preparation of the state court record, which had been summarily dismissed by the District Court. 350 U.S. 3 [76 S.Ct. 34, 100 L.Ed. 4]. This resulted in the judg-

ment which is now before us. The District Court held that no fraud had been shown. *The record of proceedings held before District Judge Goodman reveals the following additional facts as to the preparation of the state court record, none of which appear to be disputed by the State,* which has been ably and conscientiously represented here: Fraser, the substitute reporter, was an uncle by marriage of the deputy district attorney in charge of this case, *a fact of which neither the state trial court nor the appellate court were aware when they approved the transcript.* In preparing the transcript, Fraser worked in close collaboration with the prosecutor, and also went over with two police officers, who testified for the State at the trial, his transcription of their testimony. *The latter episodes were likewise unknown to the state courts when they approved the transcript.* The testimony of one of these officers concerned petitioner's alleged confession, a subject of dispute at the trial, and petitioner's list of alleged inaccuracies, already mentioned, related to some of that testimony. It also appeared at this hearing that Fraser had destroyed the 'rough' draft of his transcription which petitioner had sought to obtain during the settlement proceedings.

"Under the circumstances which have been summarized, we must hold that the *ex parte* settlement of this state *court record violated petitioner's constitutional right to procedural due process. . . .* [Footnotes 12 and 13:]

"In view of our holding we cannot regard ourselves as concluded by the California Supreme Court's holdings that the record on which it acted was adequate as a matter of state law, and that, in any event, the inaccuracies then claimed by the petitioner would not have changed the result of his appeal. Petitioner is entitled to have his conviction reviewed upon a record which has been settled in accordance with procedural due process. *Moreover, in holding as it did the state court was not aware of the fact later developed in hearings before Judge Goodman, see p. 5, supra, and we cannot know that those facts, and others that might be disclosed upon an adversary hearing focused squarely on the adequacy of the transcript, would not lead it to a different conclusion.*

"Certainly this Court's previous denials of certiorari, 350 U.S. 840 [71 S.Ct. 29, 95 L.Ed. 616]; 341 U.S. 929 [71 S.Ct. 800, 95 L.Ed. 1359]; 343 U.S. 915 [72 S.Ct. 650, 96 L.Ed. 1330]; 346 U.S. 916 [74 S.Ct. 278, 98 L.Ed. 412]; 348 U.S. 864 [75 S.Ct. 85, 99 L.Ed. 681], do not foreclose us from now granting appropriate relief. *Brown* v. *Allen,* 344 U.S. 443

[73 S.Ct. 397, 97 L.Ed. 469]. *And it may be noted that it was not until the present proceedings in the District Court that the facts surrounding the settlement of the state court record were fully developed.*" (Emphasis added.)

From the foregoing excerpt from the decision of the Supreme Court of the United States in the Chessman case it is manifest that the Supreme Court considered numerous facts entirely outside of the record both of the trial court and this court when the Chessman case was being considered by the courts of this state.

There can be no question but that the effect of the holding of the Supreme Court of the United States in the Chessman case is "that the *ex parte* settlement of this state court record violated petitioner's constitutional right to procedural due process." Such being the case, the question arises as to what constitutes "procedural due process." There can be no question but that at least one of the essential elements of "procedural due process" is *a tribunal which has the power to hear and determine* the rights of the litigants (11 Cal.Jur.2d p. 788, § 313 et seq.), and since "procedural due process" may be established by proof of facts outside of the record, it must necessarily follow that a reviewing court may resort to facts outside of the record for the purpose of determining whether or not the tribunal rendering the judgment sought to be reviewed had jurisdiction of the subject matter of the litigation. There can be no escape from this conclusion in view of the pronouncements of the Supreme Court of the United States in the recent case of *Johnson* v. *Zerbst*, 304 U.S. 458, 465, 466, 467 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357], wherein it was declared: "True, *habeas corpus* cannot be used as a means of reviewing errors of law and irregularities—*not involving the question of jurisdiction*—occurring during the course of trial; and the 'writ of *habeas corpus* cannot be used as a writ of error.' [*Woolsey* v. *Best*, 299 U.S. 1, 2 (57 S.Ct. 2, 81 L.Ed. 3).] These principles, however, must be construed and applied so as to preserve—not destroy—constitutional safeguards of human life and liberty. The scope of inquiry in *habeas corpus* proceedings has been broadened—not narrowed—since the adoption of the Sixth Amendment. In such a proceeding, 'it would be clearly erroneous *to confine the inquiry to the proceedings and judgment of the trial court*' [*Frank* v. *Mangum*, 237 U.S. 309, 327 (35 S.Ct. 582, 59 L.Ed. 969)] and the petitioned court has '*power to inquire with regard to the jurisdiction of the inferior court, either*

*in respect to the subject matter or to the person, even if such inquiry . . . [involves] an examination of facts outside of, but not inconsistent with, the record.'* [*In re Mayfield,* 141 U.S. 107, 116 [11 S.Ct. 939, 35 L.Ed. 635] ; *Cuddy, Petitioner,* 131 U.S. 280 [9 S.Ct. 703, 33 L.Ed. 154].] Congress has expanded the rights of a petitioner for *habeas corpus* [28 U.S.C., ch. 14, § 451, et seq.] and the '. . . effect is to substitute for the bare legal review that seems to have been the limit of judicial authority under the common-law practice, and under the Act of 31 Car. II, c. 2, a more searching investigation, in which the applicant is put upon his oath to set forth the truth in the matter respecting the causes of his detention, and the court, upon determining the actual facts, is to "dispose of the party as law and justice require."

" 'There being no doubt of the authority of the Congress to thus liberalize the common law procedure on *habeas corpus* in order to safeguard the liberty of all persons within the jurisdiction of the United States against infringement through any violation of the Constitution or a law or treaty established thereunder, it results that under the sections cited a prisoner in custody pursuant to the final judgment of a state court of criminal jurisdiction may have a judicial inquiry in a court of the United States into the very truth and substance of the causes of his detention, *although it may become necessary to look behind and beyond the record of his conviction to a sufficient extent to test the jurisdiction of the state court to proceed to a judgment against him. . . .*

" '. . . it is open to the courts of the United States upon an application for a writ of *habeas corpus* to look beyond forms and inquire into the very substance of the matter, . . .' " (Emphasis added.) *Frank* v. *Mangum,* 237 U.S. 309, 327 [35 S.Ct. 582, 59 L.Ed. 969] ; *Moore* v. *Dempsey,* 261 U.S. 86 [43 S.Ct. 265, 67 L.Ed. 543] ; *Mooney* v. *Holohan,* 294 U.S. 103 [55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406] ; *Hans Nielsen, Petitioner,* 131 U.S. 176 [9 S.Ct. 672, 33 L.Ed. 118]. The court concluded with the statement that *"The judgment* of conviction pronounced by *a court without jurisdiction is void,* and one imprisoned thereunder may obtain release by *habeas corpus.* A judge of the United States—to whom a petition for *habeas corpus* is addressed—should be alert to examine 'the facts for himself when if true as alleged they make the trial absolutely void.' " (*Moore* v. *Dempsey,* 261 U.S. 86, 92 [43 S.Ct. 265, 67 L.Ed. 543] ; *Patton* v. *United States,* 281 U.S. 276, 312, 313 [50 S.Ct. 253, 74 L.Ed. 854, 70 A.L.R. 263].)

The holding of the majority in the case at bar is in direct conflict with every decision of the Supreme Court of the United States since *Frank* v. *Mangum, supra,* which was decided over 40 years ago.

In *Bowen* v. *Johnston* (1939), 306 U.S. 19, 26, 27 [59 S.Ct. 442, 83 L.Ed. 455] (relied upon by the majority for the proposition that "exceptional circumstances" must exist before evidence outside the record may be examined) habeas corpus was denied on the ground that the federal district court had exclusive jurisdiction to try the petitioner for murder. The petitioner's allegation was that the federal court did not have jurisdiction to try him. The United States Supreme Court held that the requirement that a litigant resort to appellate procedure "is not a rule denying the power to issue a writ of habeas corpus when it appears that nevertheless the trial court was without jurisdiction. The rule is not one defining power but one which relates to the appropriate exercise of power." The court then proceeded to elaborate by showing that the same circumstances were present there that we have in the case at bar. It was said: "[T]he rule is not so inflexible that it may not yield to exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent. *Among these exceptional circumstances are those indicating a conflict between state and federal authorities on a question of law involving concerns of large importance affecting their respective jurisdictions.*" (Emphasis added.) In the Bowen case evidence outside the record was apparently considered inasmuch as the district court which had tried petitioner had given no consideration to the jurisdictional question since as the court stated "The matter stood without any judicial explanation and without appeal." (P. 27.) It therefore clearly appears that the so-called "exceptional circumstances" present in the Bowen case are also present in the case under consideration.

In *Waley* v. *Johnston* (1942), 316 U.S. 101, 104 [62 S.Ct. 964, 86 L.Ed. 1302], habeas corpus was granted on evidence outside the record. The court said: "The issue here [whether petitioner's plea of guilty had been coerced] was appropriately raised by the habeas corpus petition. *The facts relied on are dehors the record and their effect on the judgment was not open to consideration and review on appeal.*" (Emphasis added.)

In *United States ex rel. McCann* v. *Adams* (1943), 320 U.S.

220, 221 [648 S.Ct. 14, 88 L.Ed. 4], habeas corpus was granted on petitioner's allegation that he had not intelligently waived his right to counsel and a jury trial. The court said: "That the issue [whether he waived his right to counsel and jury trial], *now fairly tendered by the petition for habeas corpus below,* has never been adjudicated on its merits by the lower courts. But it is no longer within the bosom of the trial court. Nor can it be disposed of on appeal of his conviction, *for the claim rests on material dehors the trial proceedings.*" (Emphasis added.) Once again it is apparent that evidence outside the record may be considered on a petition for habeas corpus.

In *Moore* v. *Dempsey,* 261 U.S. 86, 87, 90 [43 S.Ct. 265, 67 L.Ed. 543] (decided in 1923 and before the Johnson case, 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357]) habeas corpus was granted on evidence outside the record on petitioners' allegation that they had been denied due process of law because their convictions of murdering a white man had been obtained through mob pressure at a trial which lasted three-quarters of an hour.

In *Frank* v. *Mangum* (1915), 237 U.S. 309, 326, 331 [35 S.Ct. 582, 59 L.Ed. 969], habeas corpus was denied on the ground that the state court's prior determination of the truth of petitioner's allegations was conclusive. It was held, however, *that a court of competent jurisdiction was an essential element of due process;* and that while evidence outside the record could not be considered at common law, the scope of review had been broadened. The court stated: "There being no doubt of the authority of the Congress to thus liberalize the common law procedure on habeas corpus in order to safeguard the liberty of all persons within the jurisdiction of the United States against the infringement through any violation of the Constitution or a law or treaty established thereunder, it results that under the sections cited a prisoner in custody pursuant to the final judgment of a state court of criminal jurisdiction may have a judicial inquiry in a court of the United States into the very truth and substance of the cause of his detention although it may become necessary *to look behind and beyond the record* of his conviction to a sufficient extent *to test the jurisdiction of the state court* to proceed to judgment against him." It was also held that "In the light, then, of these established rules and principles: that due process of law guaranteed by the Fourteenth Amendment had regard to substance of right, and not to matters of form and procedure: that it is open to the courts of the

United States upon an application for a writ of habeas corpus to look beyond the forms and *inquire into the very substance of the matter . . . whether they appear in the record or not. . . .''*

As to the attempt on the part of the majority to distinguish cases on the ground that certain specified rights such as denial of counsel, use of perjured testimony, and a conviction under an unconstitutional law, is concerned, it should be specifically noted that in the case of *Johnson* v. *Zerbst,* 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357], the court emphatically held that the right to counsel was *jurisdictional,* and that when a ''jurisdictional question'' was involved '' 'it would be clearly erroneous to confine the inquiry to the proceedings and judgment of the trial court.' ''

In the case of *Tooisgah* v. *United States,* 186 F.2d 93, which the majority holds is ''not helpful'' to Carmen, the question of jurisdiction of the federal district court had been raised at the trial and affirmed on appeal. On a collateral attack on the judgment of conviction based on the ground that the federal courts lacked jurisdiction because the land on which the crime had been committed was not ''Indian country,'' the court reversed its former decision and remanded the cause with directions to vacate the judgment and dismiss the indictment. It was held that ''The question is one of law whether the agreed and adjudicated facts bring the offense within that class over which exclusive federal jurisdiction is extended by statute. Since the motion goes squarely to the jurisdiction of the court on agreed facts; involves human liberties, as well as a possible conflict between state and federal jurisdiction over crimes committed within the boundaries of a sovereign state; and *since the question of jurisdiction was not presented or painstakingly considered* in the direct appeal, we deem it appropriate to re-examine it here.'' (Emphasis added.) On the direct appeal from the judgment of conviction Carmen, in the case at bar, tried unsuccessfully, to raise the question of jurisdiction. A majority of this court refused his application but intimated that he might have another remedy. The majority seeks to distinguish the Toosigah case on the ground that ''no new or additional facts'' were sought to be injected into the case and ''no adjudicated facts . . . sought to be impeached.'' *Davis* v. *Johnston,* 144 F.2d 862, is not like the case at bar. There the petitioner for a writ of habeas corpus had been tried by the federal district court and that court's jurisdiction had been in issue and directly

litigated in the lower court and a finding was made thereon. In the case at bar the state court assumed jurisdiction and this court would not permit the question of lack of jurisdiction to be raised on appeal. In *Matter of Heff*, 197 U.S. 488 [25 S.Ct. 506, 49 L.Ed. 848], the Supreme Court issued a writ of habeas corpus because there was a direct conflict between the state and local federal courts on the precise point of law involved, each asserting jurisdiction over the same offense. The Supreme Court in commenting on its holding in the Neff case in *In re Lincoln*, 202 U.S. 178, 183 [26 S.Ct. 602, 50 L.Ed. 984], said that the Court of Appeals in the Neff case ''had already decided the question adversely to the contention of petitioner, so that a writ of error from that court would have accomplished nothing; *and further, that the matter involved opened up inquiry into questions of great significance affecting the respective jurisdictions of the nation and the states over large numbers of Indians.* There were special reasons, therefore, for our issuing a writ of habeas corpus and investigating the matter in that case.'' (Emphasis added.) It was concluded that it could be ''assumed that the trial courts will follow the rulings of this court, and if there be in any case a departure therefrom the proper appellate court will correct the error.'' In *Toy Toy* v. *Hopkins*, 212 U.S. 542, 549 [29 S.Ct. 416, 53 L.Ed. 644], the Supreme Court, quoting from *Louisville Trust Co.* v. *Comingor*, 184 U.S. 18, 25 [22 S.Ct. 293, 46 L.Ed. 413], said: ''Jurisdiction as to the subject-matter may be limited in various ways, as to civil and criminal cases; cases at common law or in equity or in admiralty; probate cases, or cases under special statutes; to particular classes of persons; to proceedings in particular modes; and so on. In many cases jurisdiction may depend on the ascertainment of facts involving the merits, and in that sense the court exercises jurisdiction in disposing of the preliminary inquiry, although the result may be that it finds that it cannot go farther. And where, in a case like that before us, the court erroneously retains jurisdiction to adjudicate the merits, its action can be corrected on review.'' (And see *United States* v. *Shipp*, 203 U.S. 563 [27 S.Ct. 165, 51 L.Ed. 319].)

So far as the rule in this state is concerned, I had thought it settled by *In re Bell*, 19 Cal.2d 488, 501 [122 P.2d 22], that a ''petitioner seeking habeas corpus, however, is not confined to the face of the record in attempting to sustain the burden of proving that his conviction was in violation of his constitutional rights. The courts of both the United

States and California have declared that the remedy of habeas corpus permits an examination not only of the actual evidence introduced at petitioner's trial but of any necessary additional evidence bearing upon the infringement of petitioner's constitutional rights. (*Moore* v. *Dempsey*, 261 U.S. 86 [43 S.Ct. 265, 67 L.Ed. 543]; *Mooney* v. *Holohan*, 294 U.S. 103 [55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406]; *Herndon* v. *Lowry*, 301 U.S. 242 [57 S.Ct. 732, 81 L.Ed. 1066]; *Johnson* v. *Zerbst, supra*; *In re Connor*, 15 Cal.2d 161 [99 P.2d 248]; *In re Connolly*, 16 Cal.App.2d 709 [61 P.2d 490]; *In re Lake*, 65 Cal.App. 420 [224 P. 126]; *In re Chaus*, 92 Cal.App. 384 [268 P. 422]; see, also, *Fiske* v. *Kansas*, 274 U.S. 380 [47 S.Ct. 655, 71 L.Ed. 1108]; *De Jonge* v. *Oregon*, 299 U.S. 353 [57 S.Ct. 255, 81 L.Ed. 278]; *Norris* v. *Alabama*, 294 U.S. 587 [55 S.Ct. 579, 79 L.Ed. 1074]; *Powell* v. *Alabama*, 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527].) This examination is made, not to pass upon the sufficiency of the evidence to support the verdict, but to determine what the verdict actually was, so that the court may decide whether it violates constitutional guaranties. Such an examination will be made in a habeas corpus proceeding whenever a petitioner has been deprived of due process of law, *whatever form that deprivation has taken.*" We also said (*In re Connor*, 16 Cal.2d 701, 712, 713 [108 P.2d 10]) that we had the right, on habeas corpus, to inquire into jurisdictional facts whether they appear on the face of the record or not and that the scope of the inquiry might "embrace additional evidence received by this court either directly or under an order of reference. (*In re Mooney*, 10 Cal.2d 1 [73 P.2d 554].)"

It has been held that jurisdiction of a subject matter over which a court has otherwise no jurisdiction cannot be conferred by consent, stipulation (*Abalian* v. *Townsend Social Center, Inc.*, 112 Cal.App.2d 441 [246 P.2d 965]; *Miller* v. *Miller*, 52 Cal.App.2d 443 [126 P.2d 357], agreement (*Fletcher* v. *Superior Court*, 79 Cal.App. 468 [250 P. 195]), acquiescence (*Fong Chuck* v. *Chin Po Foon*, 29 Cal.2d 552 [176 P.2d 705]), silence (*Tennesen* v. *Prudential Ins. Co.*, 8 Cal.App.2d 160 [47 P.2d 1066]), appearance (*Sampsell* v. *Superior Court*, 32 Cal.2d 763 [197 P.2d 739]), or estoppel (*More Estate*, 143 Cal. 493 [77 P. 407]). Jurisdiction of the subject matter in any proceeding is conferred by law, and cannot be given, enlarged, or waived by the parties (*Harrington* v. *Superior Court*, 194 Cal. 185 [228 P. 15]). This means that where there is a want of jurisdiction of the subject matter, a pur-

ported judgment or order is void for all purposes (*Fletcher v. Superior Court,* 79 Cal.App. 468 [250 P. 195]).

It is apparently the general rule, both in the federal courts and the majority of state courts, that lack of jurisdiction of the subject matter may be raised at any time. In 14 American Jurisprudence, Courts, section 191, pages 385, 386, the following appears (supported by numerous case citations): ''Where judicial tribunals have no jurisdiction of the subject matter on which they assume to act, their proceedings are absolutely void in the strictest sense of the term; and a court which is competent to decide on its own jurisdiction in a given case may determine that question *at any time* in the proceedings of the cause, whenever that fact is made to appear to its satisfaction, either before or after judgment. Accordingly, an objection for want of jurisdiction, if it exists, may be raised by answer or at any subsequent stage of the proceedings; in fact, it may be raised for the first time on appeal. A court will recognize want of jurisdiction over the subject matter even if no objection is made. Therefore, whenever a want of jurisdiction is suggested, by the court's examination of the case or otherwise, it is the duty of the court to consider it, for if the court is without jurisdiction, it is powerless to act in the case.

''A plaintiff against whom judgment went in the lower court may on appeal raise the question of the jurisdiction of the trial court and have the judgment reversed if the court did not have jurisdiction of the subject matter, although the assumption of jurisdiction was to his advantage.

''As heretofore shown, the jurisdiction of a court over the subject matter of a cause of action may be conferred by law, and it cannot under any circumstance be conferred on a court, as such, by the consent of the parties. It naturally follows that if jurisdiction cannot be conferred by consent, the want thereof cannot be waived by any act of the parties.''

The same rule appears in 13 California Jurisprudence 2d, Courts, section 86, page 597: ''Where a judicial tribunal has no jurisdiction of the subject matter on which it assumes to act, its proceedings are absolutely void in the fullest sense of the term; and a court, being competent to determine its own jurisdiction, may determine that question at any time in the proceedings, whenever that fact is made to appear to its satisfaction, either before or after judgment. Accordingly, an objection for want of such jurisdiction may be raised by answer or at any subsequent stage of the proceedings; in fact

it may be raised for the first time on appeal. [*Mott* v. *Smith*, 16 Cal. 533; *Creditors* v. *Consumers' Lbr. Co.*, 98 Cal. 318 [33 P. 196]; *Mastick* v. *Superior Court*, 94 Cal. 347 [29 P. 869]; *Thompson, In re*, 101 Cal. 349 [35 P. 991, 36 P. 98, 508]; *People* v. *Oakland Water Front Co.*, 118 Cal. 234 [50 P. 305]; *San Diego Sav. Bank* v. *Goodsell*, 137 Cal. 420 [70 P. 299].] ...

''A court should recognize want of jurisdiction over the subject matter even if no objection is made. Therefore, whenever a want of jurisdiction is suggested, by the court's examination of the case *or otherwise*, it is the duty of the court to consider it, for if the court is without jurisdiction it is powerless to act in the case. So fundamental is the necessity that a court have jurisdiction of the subject matter, that a lack thereof may be raised on appeal or in another proceeding, even by the party who invoked the jurisdiction in the first place.'' (Emphasis added.)

In *Matson Navigation Co.* v. *United States*, 284 U.S. 352 [52 S.Ct. 162, 76 L.Ed. 336], a case arising under the Admiralty Act where exclusive jurisdiction was vested in the federal courts, the court said: ''As the want of jurisdiction is of the subject matter, it may be considered, and appropriate judgment given, at any stage of the proceedings, either here or below. *Hilton* v. *Dickinson*, 108 U.S. 165, 168 [2 S.Ct. 424, 27 L.Ed. 688]; *Gainesville* v. *Brown-Crummer Inv. Co.*, 277 U.S. 54, 59 [48 S.Ct. 454, 72 L.Ed. 781]. See *Grace* v. *American Central Ins. Co.*, 109 U.S. 278, 283-284 [3 S.Ct. 207, 27 L.Ed. 932]; *Bors* v. *Preston*, 111 U.S. 252, 255 [4 S.Ct. 407, 28 L.Ed. 419].''

In *Gainesville* v. *Brown-Crummer Inv. Co.*, 277 U.S. 54, 58, 59 [48 S.Ct. 454, 72 L.Ed. 781], the case had been tried and appealed in the federal courts. The case went up on certiorari to the United States Supreme Court. That court said: ''Objection is first made by the petitioner that there was no separable controversy and so no [federal] jurisdiction. *This question does not seem to have been presented to and was certainly not considered by the Circuit Court of Appeals.''* (Emphasis added.) After noting that the question of jurisdiction would seem to have been ''abandoned until it is now renewed in the briefs in this Court,'' the court said: ''Of course a question of jurisdiction can not be waived. *Jurisdiction should affirmatively appear, and the question may be raised at any time. Grace* v. *American Central Ins. Co.*, 109 U.S. 278, 283 [3 S.Ct. 207, 27 L.Ed. 932]; *Mansfield, C. & L. M. R. Co.* v. *Swan*, 111 U.S. 379, 382 [48 S.Ct. 510, 28

L.Ed. 462]; *Mattingly* v. *Northwestern Virginia R. Co.*, 158 U.S. 53, 56, 57 [15 S.Ct. 725, 39 L.Ed. 894].'' (Emphasis added.)

Rayna Tom Carmen was found guilty of the first degree murder of Wilbur Dan McSwain and with assault with intent to murder Alvin McSwain, Wilbur's brother. On appeal this court (*People* v. *Carmen*, 36 Cal.2d 768 [228 P.2d 281]) reversed the murder conviction and affirmed the conviction of assault with intent to commit murder. Subsequently, Rayna Tom Carmen was found guilty by a jury of first degree murder without recommendation. The judgment was affirmed by this court in August, 1954 (*People* v. *Carmen*, 43 Cal.2d 342 [273 P.2d 521]).

On appeal, defendant sought to show by the production of additional evidence that both he and the deceased, Wilbur Dan McSwain, were Indians and that the crime occurred in ''Indian country.'' It was, and is, defendant's argument that the above facts vest exclusive jurisdiction in the federal courts. In the majority opinion in *People* v. *Carmen*, 43 Cal. 2d 342, 348 [273 P.2d 521], it was held: ''We have concluded that the proposed offer to produce additional evidence on the appeal should be denied. Furthermore, even assuming that additional evidence could be received on appeal in this class of cases by stipulation or otherwise, the facts stated in the so-called 'stipulation' as well as shown in the entire record are insufficient to show exclusive jurisdiction in the federal courts.'' It was also said (at page 349): ''The evidence presented at the trial is not sufficient to permit a determination that there is exclusive federal jurisdiction in the present case, and we do not pass on the question of what remedies may be available to the defendant to show alleged lack of jurisdiction in the state court.''

After the filing of the opinion in the above mentioned case and a denial of a petition for a rehearing therein, Carmen filed a petition for a writ of habeas corpus in which he raised the question of lack of jurisdiction in the California courts and contended that exclusive jurisdiction was in the federal courts. This court issued a writ of habeas corpus returnable in San Francisco on December 8, 1954.

*State* ex rel. *Du Fault* v. *Utecht*, 220 Minn. 431 [19 N.W.2d 706, 161 A.L.R. 1316], is relied upon heavily by the People for the proposition that unless the court's lack of jurisdiction is clear and undisputable from the face of the record, habeas

corpus ought not to be granted to review an erroneous determination by a court that it has territorial jurisdiction over an offense and that, in general, an applicant for habeas corpus in such a case will be left to his remedy by writ of error or appeal.

In the first instance there are several distinguishing features between the case under consideration and the Utecht case. *First, Utecht did not raise the question of jurisdiction on appeal as did Carmen in the instant case; secondly, while Utecht was a Chippewa Indian, the crime was committed* (according to the court) *upon an Indian allotment for which a trust patent had been issued.* The crime in the Carmen case was committed on the Maggie Jim Allotment but the land was at that time still held in trust by the United States government and no fee patent had been issued. (It was issued, subsequent to the crime, in 1952.)

While it is difficult to ascertain the exact holding in the Utecht case, the following statement (page 707) appears to recognize that had no fee patent been issued, a different solution might have been reached: *"The facts set out in petitioner's application for the writ of habeas corpus, if true, would deprive the state courts of jurisdiction in this matter. A state's jurisdiction does not extend over individual members of an Indian tribe in so-called 'Indian country.' State* v. *Jackson,* 218 Minn. 429 [16 N.W.2d 752]. . . .

"In the original proceedings before the district court of Carlton county, there is no reference to the fact that the place where the crime was committed was within an Indian reservation on an Indian allotment, and no reference to the fact that relator is a member of the Chippewa tribe of Indians and a ward of the government, except that at the pre-sentence examination relator was asked by the court:

" 'Let's see: Do you belong to the Chippewa tribe: A. Yes.' "

The Utecht case was, apparently, decided on the theory that defendant should have brought the court's lack of jurisdiction (although this is dubious since the crime was committed on land to which a patent in fee had been issued and was, hence, no longer Indian country) to the attention of the court on appeal. Utecht did not perfect an appeal. Carmen sought to have the matter determined on appeal. It will be recalled that a majority of this court determined (43 Cal.2d 342) that Carmen's "proposed offer to produce additional evi-

dence on the appeal should be denied. Furthermore, even assuming that additional evidence could be received on appeal in this class of cases by stipulation or otherwise, the facts stated in the so-called 'stipulation' as well as shown in the entire record are insufficient to show exclusive jurisdiction in the federal courts. . . .

"The evidence presented at the trial is not sufficient to permit a determination that there is exclusive federal jurisdiction in the present case, *and we do not pass on the question of what remedies may be available to the defendant to show alleged lack of jurisdiction in the state court.* Nothing in the record indicates that the location of the crime was 'Indian country' within the meaning of any of the statutes which have been cited. (See e.g., 18 U.S.C. §§ 1151, 1152, 1153, and 3242.) While there was evidence that defendant and the victim were 'Indians,' the use of this term, without more, shows only that the persons were Indians by race and blood." (Emphasis added.) *We know, therefore, that the fact that defendant and the deceased were both Indians appeared on the face of the record.*

It is of interest to note that in the courts of the United States (see discussion, *supra*), there may be a judicial inquiry into the very truth and substance of the causes of a defendant's detention although it may become necessary to look behind and beyond the record of his conviction to a sufficient extent to test the jurisdiction of the state court to proceed to a judgment against him. (*Johnson* v. *Zerbst*, 304 U.S. 458, 466-468 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357] ; *Wong Doo* v. *United States*, 265 U.S. 239 [44 S.Ct. 524, 68 L.Ed. 999] ; *Salinger* v. *Loisel*, 265 U.S. 224 [44 S.Ct. 519, 68 L.Ed. 989].)

The Utecht case, while factually very similar, has really no application to the case at bar. *A majority of this court refused to permit Carmen to produce additional evidence on appeal on the question of jurisdiction of the subject matter*; there was no appeal in the Utecht case where that court held the question of jurisdiction should have been considered. The crime in the Carmen case was committed in Indian country; in the Utecht case, a patent in fee had been issued (see the various cases cited *infra* holding that an Indian is emancipated when he has received a patent in fee to land; and section 349, title 25, U.S.C.A., which provides that when the lands have been so conveyed "then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the

State or Territory in which they may reside. . . .'') In Minnesota there is an appeal from the denial of a petition for a writ of habeas corpus and there may not be successive petitions for the writ on the same set of facts. Such is not the law in California.

In *State* ex rel. *Irvine* v. *District Court,* 125 Mont. 398 [239 P.2d 272, 275], the accused was an Indian. The crime of burglary committed on an Indian reservation was involved. The Montana court held that it had no jurisdiction in that exclusive jurisdiction was in the federal courts; that defendant was an Indian and a ward of the government. It was held that the question of jurisdiction ''should be inquired into by the court at the earliest inception on its own initiative to ascertain whether that particular court has jurisdiction of that class of offense. *In re Coy,* 127 U.S. 731, 758 [8 S.Ct. 1263, 32 L.Ed. 274]; *Barnes* v. *Hunter,* 10 Cir., 188 F.2d 86, 89; *Tooisgah* v. *United States,* 10 Cir., 186 F.2d 93, 96.

''It should be kept in mind that all congressional legislation relative to Indians and Indian affairs has been initiated and enacted for the benefit of the Indian. As was stated by the supreme court, 'According to a familiar rule, legislation affecting the Indians is to be construed in their interest, and a purpose to make a radical departure is not lightly to be inferred.' *United States* v. *Nice,* 241 U.S. 591, 599, 600 [36 S.Ct. 696, 698, 60 L.Ed. 1192].

'' 'The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history.' *Rice* v. *Olson,* 324 U.S. 786 [65 S.Ct. 989, 89 L.Ed. 1367].'' It was also held that ''Exclusive jurisdiction over the Indian for this purpose has always been claimed and asserted by the general government, on the ground that the Indian is a ward thereof, and dependent thereon, and until fully emancipated and discharged from that condition, Title 25, § 349, U.S.C.A., the federal government continues to assert its exclusive jurisdiction to punish its ward for the committing of the enumerated offenses.''

With the above rules in mind, on May 26, 1955, this court made an order of reference propounding certain questions to counsel for petitioner Carmen and the attorney general. Pursuant to said order, hearings were held and testimony taken at Sacramento on December 14, 1955, at Madera on February 20, 1956, and at San Quentin on February 23, 1956. On May 17, 1956, the referee, the Honorable John P. McMur-

ray, Judge of the Superior Court of Inyo County, California, filed with this court the following findings:*

"1. Did Rayna Tom Carmen and Wilbur Dan McSwain belong to a tribe or tribes of Indians? If so, the extent, nature and character of the tribal organization.

"Your Referee finds that Rayna Tom Carmen and Wilbur Dan McSwain did belong to a tribe of Indians, namely, the Mono Indians who live in the North Fork area in Madera County in this state.

"The extent, nature and character of the tribal organization to which these men belonged was a loose type of tribal organization which, however, has its own language. Perhaps the main distinguishing tribal feature is a primitive burial ceremony upon the death of a member of the tribe. The tribe is divided into two classes, the Eagles and the Coyotes. If a Coyote dies, the Eagles render certain services at his funeral and vice versa. The squaws, if a member of the family dies, cut their hair short during the funeral. The funeral consists in a celebration of several days at which there is a great deal of crying and some singing. A year after the funeral ceremony the members of the family of the deceased abstain from eating meat or greasy foods for twenty-four hours and before a second ceremony begins the participants in the ceremony wash their faces with a gray odoriferous weed which is called 'sorrop' in the Mono language. Some members of the tribe still weave baskets of distinctive designs and use the cradleboard of 'hoops' in which to carry babies. These cradleboards are woven in such a manner as to allow the sex of the child to be put on the eyeshade after the child is born. The child's sex is indicated by a tribal pattern, one indicating that the baby is a boy and the other indicating that the baby is a girl. The members of the tribe at times meet in order to raise money to protect their interests as Indians. The meetings are held as a tribal matter, but the protection sought is as California Indians, not as Mono Indians. They also hold social gatherings several times a year which are restricted to the members of the tribes. It is customary for members of the tribe to collect acorns which are ground into flour and meal and are baked into bread. They also consider the butterfly worm as a delicate item of diet.

---

* A majority of this court now neatly sidesteps the findings of the Referee on the questions propounded by stating that it is unnecessary to discuss the question of whether the evidence is sufficient to support the findings.

"2. Were petitioner Rayna Tom Carmen and Wilbur Dan McSwain listed on the census roll of Indians of California kept by the United States Department of Interior, Bureau of Indian Affairs, as members of an Indian tribe?

"Yes, both Rayna Tom Carmen and Wilbur Dan McSwain were listed on the census roll of the Indians of California kept by the United States Department of Interior, Bureau of Indian Affairs as members of the Mono tribe of Indians. The name of Wilbur Dan McSwain, however, was later removed in accordance with a 1950 amendment dealing with Indians listed on the census roll.* In order to be eligible for enrollment a person must have proof of ancestry which goes back to 1852. The main purpose of this census roll is to determine eligibility for any land assignment.

"3. If either of them belonged to a tribe of Indians did they or either of them sever tribal relations or become otherwise emancipated from his tribe?

"Neither of the named persons ever severed tribal relations or became otherwise emancipated from his tribe.

"4. Had the Department of Indian Affairs acted in any way toward defendant Rayna Tom Carmen or the victim of the homicide, Wilbur Dan McSwain?

"The Department of Indian Affairs appeared in the Supreme Court informally on behalf of defendant Rayna Tom Carmen, but there is no evidence that it at any time acted in any way toward the victim of the homicide, Wilbur Dan McSwain. The department collected and delivered to Carmen's mother his distributive share of a judgment obtained for certain California Indians at a time after his conviction which led to his present incarceration. Rayna Tom Carmen also attended the Federal Indian School at Stewart, Nevada, near Carson City, a federally operated Indian school, and subsequently went to the Sherman Institute, a federally operated Indian school in Riverside County, California.

"5. To what extent if any did the Department of Indian Affairs exercise supervision over the place of abode or manner in which these parties lived?

"The Department of Indian Affairs did not exercise any supervision over the place of abode or manner of life of

---

* The transcript of the hearings on reference shows, at page 15, that Wilbur Dan McSwain's name was removed because of his death. His death occurred on April 22, 1950. An amendment was passed on May 24, 1950 which provided that persons "must be living on the date of the Act in order to be enrolled."

either of these parties, but there is testimony that it never acts in such manner with any California Indians.

"6. Had there been any agreement between the United States and the tribes to which they belonged?

"There had never been any agreement between the United States and the tribe to which either of these parties belonged.

"7. Had either of these parties ever received an allotment of land because he was an Indian or of Indian descent? If so, what if any disposition has been made of such land?

"Neither party had ever received any allotment of land because he was an Indian or of Indian descent. Therefore, no disposition was ever made of any such land."

Mr. Linn, Assistant Attorney General, stipulated at the first hearing on reference (page 3 of the transcript) that "the United States of America did, on November 26, 1920, issue an allotment to the foregoing described lands [where the crime was committed] to Maggie Jim, a Mono Indian, that said described lands at all times have been and are now* held in trust by the United States of America." It was also stipulated by counsel that this allotment was not part of, nor had it been part of, an Indian reservation.

The only real question here involved is whether the federal government in 1950, the year in which the crime occurred, had exclusive jurisdicton over crimes of this type in any case involving Indians and Indian country. This question is also bypassed by a majority of this court because of its holding that lack of jurisdiction must appear on the face of the record in order to entitle a petitioner to its benefits unless unusual circumstances appear and that there are no such unusual circumstances in the case at bar. I have heretofore shown that this court admitted (43 Cal.2d 342, 349) that "there was evidence that defendant and the victim were 'Indians,'" and the location of the crime was also in evidence at the time of trial although it may not have been specifically referred to as Indian Country it was referred to as the "Maggie Jim Allotment." I am of the opinion, therefore, that even by adopting the restrictive rule of the scope of habeas corpus subscribed to by the majority (and which, in my view, overrules the more liberal and salutary rules of *In re Bell*, 19 Cal.2d 488 [122 P.2d 22], and *In re Connor*, 16 Cal.2d 701 [108 P.2d 10]), Carmen was entitled to have the question of the juris-

---

* Subsequent to the crime, in 1952, a fee patent to this land was issued to Dan McSwain, the father of the victim Wilbur Dan Mc-Swain, and the husband of Maggie Jim.

diction of the California court determined. One is surely deprived of a substantial constitutional right when he is tried, found guilty, and sentenced by a court having no jurisdiction of the subject matter!

Defendant argues that the state court was without jurisdiction in this case and that exclusive jurisdiction was vested in the United States and its courts by reason of sections 1151, 1152, 1153, and 3242 of the United States Code Annotated, as amended May 24, 1949. (U.S.C.A., tit. 18.) With this contention I agree.

Section 1151 provides as follows: ''Except as otherwise provided in sections 1154 and 1156 of this title [those sections have reference to sales of liquor to Indians and the definition of the term 'Indian country' as it relates to the liquor laws], the term 'Indian country,' as used in this chapter, means (a) all lands within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) *all Indian allotments, the Indian titles to which have not been extinguished,* including rights-of-way running through the same.'' (Emphasis added; June 25, 1948, ch. 645, 62 Stat. 757, amended May 24, 1949, ch. 139, § 25, 63 Stat. 94.)

Taking the problem here involved step by step, it has been stipulated that the crime was committed on an Indian allotment, the Indian title to which had not been extinguished at the time of the crime. The People argue that in order for such an allotment to come within the definition of ''Indian country'' it must have been part, at one time, of an Indian reservation. This argument stems from House Report Number 314, 80th Congress, page 492, wherein it is stated that Indian allotments were included in the definition of Indian country on the authority of *United States* v. *Pelican*, 232 U.S. 442 [34 S.Ct. 396, 58 L.Ed. 676]. In the Pelican case, a full blood Indian was murdered on land allotted to one Agnes, an Indian. The allotment had formerly been part of the Colville Indian reservation which, with certain exceptions, had been, by Act of Congress (July 1, 1892, ch. 140, 27 Stat. 62) vacated and restored to the public domain. The exceptions were made by Congress to care for the Indians residing on that portion of the reservation. Each Indian was entitled to

select 80 acres which was allotted to him in severalty, the title being held in trust for his benefit for 25 years and then transferred in fee to him or his heirs. During the trust period, the lands were inalienable.

The People's position is that because the allotted lands were once part of an Indian reservation they were considered by the court to continue to be Indian country. The District Court in the Pelican case had held that the Agnes allotment was not Indian country within the meaning of the statute. The Supreme Court reversed. It was said at page 447: "Although the lands were allotted in severalty, they were to be held in trust by the United States for 25 years for the sole use and benefit of the allottee, or his heirs, and during this period were to be inalienable. That the lands, being so held, continued to be under the jurisdiction and control of Congress for all governmental purposes relating to the guardianship and protection of the Indians, is not open to controversy. *United States* v. *Rickert,* 188 U.S. 432, 437 [23 S.Ct. 478, 47 L.Ed. 532]; *McKay* v. *Kalyton,* 204 U.S. 458, 466, 468 [27 S.Ct. 346, 51 L.Ed. 566]; *Couture* v. *United States,* 207 U.S. 581 [28 S.Ct. 259, 52 L.Ed. 350]; *United States* v. *Celestine,* 215 U.S. 278, 290, 291 [30 S.Ct. 93, 54 L.Ed. 195]; *United States* v. *Sutton,* 215 U.S. 291 [30 S.Ct. 116, 54 L.Ed. 200]; *Marchie Tiger* v. *Western Invest. Co.,* 221 U.S. 286, 315, 316 [31 S.Ct. 578, 55 L.Ed. 738]; *Hallowell* v. *United States,* 221 U.S. 317 [31 S.Ct. 587, 55 L.Ed. 750]; *United States* v. *Wright,* 229 U.S. 226, 237 [33 S.Ct. 630, 57 L.Ed. 1160]." It was further held (page 449) that "The lands, which, prior to the allotment, undoubtedly formed part of the Indian country [as a reservation], still retain during the trust period a distinctively Indian character, being devoted to Indian occupancy under the limitations imposed by Federal legislation. The explicit provision in the act of 1897, as to allotments, we do not regard as pointing a distinction, but rather as emphasizing the intent of Congress in carrying out its policy with respect to allotments in severalty where these have been accompanied with restrictions upon alienation or provision for trusteeship on the part of the Government. In the present case, the original reservation was Indian country simply because it had been validly set apart for the use of the Indians as such, under the superintendence of the Government. *Donnelly* v. *United States, supra* [228 U.S. 243 (33 S.Ct. 449, 57 L.Ed. 820, Ann.Case. 1913E 710)]. The same considerations, in substance, apply to the allotted lands which, when the

reservation was diminished, were excepted from the portion restored to the public domain. The allottees were permitted to enjoy a more secure tenure, and provision was made for their ultimate ownership without restrictions. *But, meanwhile,* the lands remained Indian lands, set apart for Indians under governmental care; and we are unable to find ground for the conclusion that they became other than Indian country through the distribution into separate holdings, the Government retaining control.

"It is said that it is not to be supposed that Congress has intended to maintain the Federal jurisdiction over hundreds of allotments scattered through territory other portions of which were open to white settlement. But Congress expressly so provided with respect to offenses committed in violation of the act of 1897. Nor does the territorial jurisdiction of the United States depend upon the size of the particular areas which are held for Federal purposes (Criminal Code, § 272). *It must be remembered that the fundamental consideration is the protection of a dependent people.*" (Emphasis added.) The court continued and after explicitly noting that Congress amended the original act to provide "That until the issuance of fee-simple patents all allottees to whom trust patents shall hereafter be issued shall be subject to the exclusive jurisdiction of the United States" (section 349, title 25, U.S.C.A. continues to so provide) said: "We deem it to be clear that Congress had the power thus to continue the guardianship of the Government. (*United States* v. *Kagama,* 118 U.S. 375, 383, 384 [6 S.Ct. 1109, 30 L.Ed. 228]; *United States* v. *Celestine, supra; Marchie Tiger* v. *Western Invest. Co., supra; Hallowell* v. *United States, supra; Heckman* v. *United States,* 224 U.S. 413, 437 [32 S.Ct. 424, 56 L.Ed. 820]; *Ex parte Webb,* 225 U.S. 663, 683 [32 S.Ct. 769, 56 L.Ed. 1248]; *United States* v. *Wright, supra; United States* v. *Sandoval,* 231 U.S. 28, 46 [34 S.Ct. 1, 58 L.Ed. 7]; *Perrin* v. *United States,* decided this day, *post,* p. 478 [232 U.S. 478 (34 S.Ct. 387, 58 L.Ed. 697)]); and these provisions leave no room for doubt as to the intent of Congress with respect to the maintenance of the Federal jurisdiction over the allotted lands described in the indictment."

The foregoing quotations from the Pelican case show that the case did not stand for the proposition that allotments must be carved from Indian reservations before they could be considered as falling within the definition of Indian country. "It must be remembered that the fundamental consideration

is the protection of a dependent people.'' Section 334, title 25, U.S.C.A. provides for allotments to Indians ''not residing upon a reservation, or for whose tribe no reservation has been provided by treaty, Act of Congress, or Executive order . . . and patents shall be issued to them for such lands in the manner and with the restrictions as provided in sections 348 and *349*.'' Section 349 provides that ''At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, as provided in section 348, then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside . . . *Provided further,* That until the issuance of fee-simple patents all allottees to whom trust patents shall be issued shall be subject to the *exclusive jurisdiction* of the United States. . . .'' (Emphasis added.) It clearly appears that neither Congress, nor the Supreme Court in the Pelican case, intended that the jurisdiction of the United States over land held in allotment should differ depending upon whether that land had once been part of an Indian reservation.

The contrary appears to be true in light of the Pelican case. In that case the argument was that because the land where the crime occurred was at the time of the crime allotted to an Indian rather than still part of a reservation it was no longer ''Indian country.'' The court's entire opinion is devoted to showing that allotted land, the title to which was still held in trust by the government, was under the exclusive jurisdiction of the government for the protection of the Indian enjoying the use and benefit thereof.

The People rely on *United States* v. *McGowan*, 302 U.S. 535 [58 S.Ct. 286, 82 L.Ed. 410], for the proposition that a state may exercise its criminal jurisdiction over the ''same criminal act'' and that the federal government does not assert exclusive jurisdiction in a situation such as we have here. In the McGowan case the court stated (p. 536) that the only question for determination was whether the Reno Indian Colony was Indian country so far as regulation of the sale of intoxicants to Indians was concerned. It was held (p. 537, et seq.) that ''The words 'Indian country' have appeared in the statutes relating to Indians for more than a century. We must consider 'the changes which have taken place in our situation, with a view of determining from time to time what must be regarded as Indian country where it is spoken of in the statutes.' Also, due regard must be given

to the fact that from an early period of our history, the Government has prescribed severe penalties to enforce laws regulating the sale of liquor on lands occupied by Indians under government supervision. Indians of the Reno Colony have been established in homes under the supervision and guardianship of the United States. The policy of Congress, uniformly enforced through the decisions of this Court, has been to regulate the liquor traffic with Indians occupying such a settlement. This protection is extended by the United States 'over all *dependent Indian communities within its borders,* whether within its original territory or territory subsequently acquired, and *whether within or without the limits of a State.'* [Italics added.]

"The fundamental consideration of both Congress and the Department of the Interior in establishing this colony has been the protection of a dependent people. Indians in this colony have been afforded the same protection by the government as that given Indians in other settlements known as *'reservations.'* Congress *alone* has the right to determine the manner in which this country's guardianship over the Indians shall be carried out, *and it is immaterial whether Congress designates a settlement as a 'reservation' or 'colony.'* In the case of *United States* v. *Pelican,* 232 U.S. 442, 449 [34 S.Ct. 396, 58 L.Ed. 676], this Court said:

" 'In the present case the original reservation was Indian country simply because *'it had been validly set apart for the use of the Indians as such, under the superintendence of the Government.'* [Italics added.]

"The Reno Colony has been validly set apart for the use of the Indians. It is under the superintendence of the Government. The Government retains title to the lands which it permits the Indians to occupy. The Government has authority to enact regulations and protective laws respecting this territory. ' . . . Congress possesses the broad power of legislating for the protection of the Indians wherever they may be within the territory of the United States . . .' *United States* v. *Ramsey,* 271 U.S. 467, 471 [46 S.Ct. 559, 70 L.Ed. 1039].

"When we view the facts of this case in the light of the relationship which has long existed between the Government and the Indians—and which continues to date—*it is not reasonably possible to draw any distinction between this Indian 'colony' and 'Indian country.'* We conclude that section 247 of Title 25, *supra,* does apply to the Reno Colony.

"The federal prohibition against taking intoxicants into

this Indian colony does not deprive the State of Nevada of its sovereignty over the area in question. The Federal Government does not assert exclusive jurisdiction within the colony. *Enactments of the Federal Government passed to protect and guard its Indian wards only affect the operation, within the colony, of such state laws as conflict with the federal enactments.*" (Emphasis added.)

It should be noted that the McGowan case does not even consider whether or not the "Colony" was once part of an Indian reservation. It is specifically stated that the Colony consists of approximately 28 acres of land, title to which was in the United States, and that the colony was created to provide homes for needy Indians.

It follows, therefore, that title to the land here involved, known as the Maggie Jim Allotmant, was still held in trust by the United States government at the time the crime was committed and that it falls within the statutory definition of "Indian country." (U.S.C.A. title 18, § 1151.)

Section 1152 [U.S.C.A., title 18] provides: "Laws governing.

"Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

"This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."

Section 1153 provides in pertinent part: "Offenses committed within Indian country.

"Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, *murder,* manslaughter, rape, incest, *assault with intent to kill,* assault with a dangerous weapon, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the *exclusive* jurisdiction of the United States." (The second paragraph of this section relates to rape; the third paragraph to burglary. Both provide that the crimes shall be defined

as provided by the laws of the state in which they are committed. Burglary is to be punished in accordance with the laws of the state in which it is committed.) (June 25, 1948, ch. 645, 62 Stat. 758, amended May 24, 1949, ch. 139, § 26, 63 Stat. 94.) (Emphasis added.)

Section 3242 provides that: "All Indians committing any of the following offenses, namely, *murder*, manslaughter, rape, incest, *assault with intent to kill*, assault with a dangerous weapon, arson, burglary, robbery, and larceny on and within the Indian country, shall be tried in the same courts, and in the same manner, as are all other persons committing any of the above crimes within the *exclusive* jurisdiction of the United States." (Emphasis added; June 25, 1948, ch. 645, 62 Stat. 827, amended May 24, 1949, ch. 139, § 51, 63 Stat. 96.)

As hereinbefore set forth, the referee found that both petitioner and the victim, Wilbur Dan McSwain, were Mono Indians and that both were listed as such on the census roll of Indians of California kept by the United States Department of Interior, Bureau of Indian Affairs.

The People argue that an Indian who has become emancipated in some manner from his tribe is to be treated as a non-Indian for the purpose of jurisdiction in a case such as this, and there are cases so holding. In *Eugene Sol Louie* v. *United States*, 274 F. 47, the emancipation of the Indian took place when he received a patent in fee to land; *in-People* v. *Ketchum*, 73 Cal. 635 [15 P. 353], the defendant was held not to be a member of any Indian tribe; in *State* v. *Bush*, 195 Minn. 413 [263 N.W. 300], the defendant Indian held land by a patent in fee; *in State* v. *Monroe*, 83 Mont. 556 [274 P. 840], defendant Indian held land by a patent in fee; *in People* ex rel. *Schuyler* v. *Livingstone*, 123 Misc. 605 [205 N.Y.S. 888], defendant was an Indian, but not a member of any tribe; in *State* v. *Nimrod*, 30 S.D. 239 [138 N.W. 377], defendant was an Indian and held land by patent in fee under the Dawes Act; *in State* v. *Howard*, 33 Wash. 250 [74 P. 382], the defendant was an Indian but not a member of any tribe. In the case under consideration, neither the defendant Carmen, nor the deceased McSwain, had ever received a patent in fee from the government or had been otherwise emancipated in any way.

Despite the specific finding of the referee that neither of the two Indians involved had ever been emancipated or had severed tribal relations from the tribe to which they be-

---

* See section 349, Title 25, U.S.C.A., heretofore quoted.

longed, the People argue that they were "emancipated" Indians; that neither of them was ever controlled in any way by the Bureau of Indian Affairs or by the Indian organization. It is contended that both Carmen and the deceased McSwain were free to do as they pleased without interference from either the federal government or by an Indian agent. The referee specifically pointed out that the Department of Indian Affairs does not exercise supervision over any California Indians. These arguments of the People are without merit in view of the referee's findings and the evidence supporting them. The record also shows that the Mono Indians (including Carmen and McSwain) lived in "tribal ways"; that they have a "chief"; and that they have "meetings once in a while of their own"; that the burial service is referred to as a "powwow" (Transcript on Reference, pp. 46, 47).

The People also contend that the case of *United States* v. *Kagama,* 118 U.S. 375 [6 S.Ct. 1109, 30 L.Ed. 228], with its wardship theory, is obsolete. From this it is argued that because Indians are now citizens of the United States and of the state in which they reside (U.S.C.A., tit. 8, § 1401 [formerly tit. 8, §§ 601, 604] ; *Anderson* v. *Mathews,* 174 Cal. 537 [163 P. 902] ; *Piper* v. *Big Pine School Dist.,* 193 Cal. 664 [226 P. 926]) they should be subject to the laws of the state in which they reside. It is said, with merit, that Congress itself has recognized the change in the condition of the California Indian in that it has expressly stated that California has jurisdiction over crimes by Indians in Indian country within the state. Public Law 280 was passed by the first session of the 83rd Congress, 1953, giving to California jurisdiction in such situations. *The fact remains, however, that at the time the crime in question was committed Congress had not seen fit to so act.*

The statutes here involved, which in my opinion provide for exclusive jurisdiction of the federal court in cases such as this, have a background of wisdom and foresight. Those conversant with the early history of the western states will recall the bitter conflicts between the native Indians and the white immigrants who first settled these states. As a result of the bitterness engendered by these struggles a strong feeling of prejudice existed against the remaining Indian population after the white man became master of the western domain and established an organized system of government therein. The early history of California is replete with in-

stances in which native Indians were denied redress in our courts because of this prejudice. As a result of this situation, which is well known to those whose memories go back two or three generations, the federal government saw fit, in the administration of its wardship over the remaining Indian population, to provide that the federal courts should have exclusive jurisdiction in cases such as this and thereby removed the Indian from whatever disadvantage he might have by being prosecuted in state courts in an area where prejudice against the Indian might still exist. These statutes remained in effect so far as California is concerned until 1953 which was long after the commission of the crime here involved.

It appears from the foregoing that since defendant Rayna Tom Carmen and the victim, Wilbur Dan McSwain, were unemancipated Mono Indians and that the Maggie Jim Allotment on which the crime occurred was Indian country, the Superior Court in and for the County of Madera, State of California, was without jurisdiction to try defendant Rayna Tom Carmen for the crimes with which he was charged.

For the foregoing reasons the prisoner should be discharged.

TRAYNOR, Concurring and Dissenting.—I concur in the holding of the court insofar as it constitutes a rule of decision for the disposition of cases arising in the future. It is clear, however, from the authorities cited in both the majority and the dissenting opinion that the question of the availability of habeas corpus to attack subject matter jurisdiction by proof of facts outside the record has been clouded in uncertainty in this state. (See also Edmonds, J., concurring, *In re Bell,* 19 Cal.2d 488, 506-507 [122 P.2d 22] ; *In re Wyatt,* 114 Cal. App. 557, 562 [300 P. 132] ; 1 Witkin, California Procedure, Jurisdiction, § 162, pp. 429-430.) The United States Supreme Court appears to have recognized a similar uncertainty with respect to the federal rule. (See *Rice* v. *Olson,* 324 U.S. 786, 791 [65 S.Ct. 989, 89 L.Ed. 1367].) In *Phelan* v. *Superior Court,* 35 Cal.2d 363 [217 P.2d 951], this court considered the effect of uncertainty in the law as to the adequacy of the remedy by appeal on the right to attack an order of the trial court by writ of mandate. It stated: "In view of the uncertainty which has existed in the law with respect to the appealability of the order in question and also in view of the holdings of this court that an appeal is not adequate in a case of this type, petitioner should not be denied the use of the writ because of his failure to appeal. It would obviously

be a hardship upon a litigant who has been misled by such uncertainty in the law if we were to resolve the uncertainty and in the same proceeding deny his petition for a writ on the ground that he in fact did have an adequate remedy by appeal.'' (35 Cal.2d at 371-372; see also *In re Bine,* 47 Cal.2d 814, 818 [306 P.2d 445].) Similarly, the uncertainty that has existed as to the availability of the writ of habeas corpus to attack the jurisdiction of the trial court in a case of this sort should preclude holding concurrently with the resolution of that uncertainty that such an attack can only be made in the trial court, at least when, as in this case, petitioner's attempt to raise the issue on appeal makes clear that he has not sought to abuse the remedy by delaying the attack until conviction in the federal courts would become difficult or impossible.

I concur in the conclusion of Justice Carter that the evidence taken before the referee establishes that the Superior Court in and for the County of Madera, State of California, was without jurisdiction to try petitioner for the crimes with which he was charged, and accordingly, I would discharge the prisoner.

SCHAUER, J., Dissenting.—Notwithstanding the long continued contest in the litigation before us it appears to me that there is no real basis for debate on the controlling issue. If we had a record disclosing a substantial conflict in evidence as to the facts upon which state jurisdiction depends then the majority conclusion would be tenable. But we have no such record.

Upon the facts shown, the Constitution (art. VI, § 2) and laws (18 U.S.C.A. §§ 1151, 1152, 1153, 3242) of the United States operate to vest exclusive jurisdiction of the subject matter of this case—the penal responsibility of the petitioner for the act allegedly constituting the crime for which he was tried and convicted—in the courts of the United States. Jurisdiction of the subject matter of an action is vested in, or prohibited to, a court by the Constitution, federal or state, and as may be defined or implemented by statutes which do not transgress constitutional limits. (See *Harrington* v. *Superior Court* (1924), 194 Cal. 185, 188 [2] [228 P. 15] [''Jurisdiction in any proceeding is conferred by law; that is, by the constitution or by statute''].) Jurisdiction of the subject matter exists by law or it does not exist and cannot be acquired. (See *Schlyen* v. *Schlyen* (1954), 43 Cal.2d

361, 375 [17] [273 P.2d 897]; *Taylor* v. *Taylor* (1923), 192 Cal. 71, 78 [6] [218 P. 756, 51 A.L.R. 1074] ["Neither a party, nor both parties, can vest a court with jurisdiction to which it is a stranger"]; *King* v. *Kutner-Goldstein Co.* (1901), 135 Cal. 65, 67 [67 P. 10]; *Costa* v. *Banta* (1950), 98 Cal. App.2d 181, 182 [2] [219 P.2d 478]; *Higgins* v. *Coyne* (1946), 75 Cal.App.2d 69, 70 [1] [170 P.2d 25]; *Glass* v. *Bank of America etc. Assn.* (1936), 17 Cal.App.2d 645, 647 [3] [62 P.2d 764]; *Mannix* v. *Superior Court* (1933), 133 Cal.App. 740, 743 [3] [24 P.2d 507] ["A court cannot, by presuming to act, invest itself with jurisdiction"].) "[J]udicial duty is not less fitly performed by declining ungranted jurisdiction [or, here, jurisdiction which the Congress has declared is in the federal courts] than in exercising firmly that which the Constitution and the laws confer." (*Ex parte McCardle* (1868), 7 Wall. (U.S.) 506, 515 [19 L.Ed. 264].)

Since by force of federal law jurisdiction over petitioner's act and his penal responsibility therefor is vested in the federal courts and therefore prohibited to California the petitioner is entitled to discharge from state custody.